## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

---

DONALD GRADY II,

       Plaintiff,

-vs-                                Case No: 14-cv-1245

BOARD OF TRUSTEES OF NORTHERN        Jury Demanded
ILLINOIS UNIVERSITY, F. WILLIAM
NICKLAS, JOHN G. PETERS, STEVEN
CUNNINGHAM, JERRY D. BLAKEMORE,
DEBRA BOUGHTON, KATHERINE LITTLE,
RANDI NAPIENTEK; JONATHON
OSTENBURG, and MICHAEL STANG,

       Defendants.

---

## FIRST AMENDED COMPLAINT

---

Plaintiff, Donald Grady II ("Plaintiff" or "Grady"), by his undersigned counsel, complains of Defendants, Board Of Trustees of Northern Illinois University ("Board"), and current or former University administrators and employees named individually above, as follows:

## I. JURISDICTION AND VENUE

1. Plaintiff is alleging that Defendants discriminated and retaliated against him - and denied him substantive and procedural due process - by terminating him in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (Title VII), the Due Process Clause and Equal Protection Clause of the U.S. Constitution, 42 U.S.C. §§ 1981 and 1983, the Illinois State Officials and Employees

Ethics Act, 5 ILCS 430/1-1 et seq. (Ethics Act), and the Illinois Whistleblower Act, 740 ILCS 174/1 et seq. Plaintiff seeks injunctive relief, compensatory relief for the injuries caused by Defendants' unlawful conduct, and punitive damages for their malicious or wanton violation of his rights.

2.   This court has jurisdiction of Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (42 U.S.C. § 1983 jurisdiction). The court also has supplemental jurisdiction of Plaintiff's claims under Illinois law pursuant to 28 U.S.C. § 1367.

3.   Plaintiff has properly met all administrative and procedural prerequisites for filing this action.

4.   The Northern District of Illinois is the proper venue for this action, pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district, and Northern Illinois University maintains a campus which is located, in part, in the Eastern Division of the Northern District of Illinois.

## II. PARTIES

5.   Plaintiff Donald Grady II is an adult resident of the State of Illinois currently residing at 3131 Fairway Oaks Drive, DeKalb, Illinois, 60115. Grady is African-American.

6.   Defendant Board is the body politic and corporate authorized by Illinois law to operate, manage, control, and maintain Northern Illinois University ("NIU" or "University"), a public university of the State of Illinois. Defendant Board is an

employer within the meaning of Title VII.

7.  Defendant John G. Peters is an adult resident of the State of Illinois. Defendant Peters was the President of NIU from June 2000 to June 30, 2013. All actions alleged in this Complaint to have been taken by Defendant Peters were taken under color of state law within the meaning of 42 U.S.C. § 1983. Defendant Peters is being sued in this matter in his individual capacity.

8.  Defendant F. William Nicklas is an adult resident of the State of Illinois. From November 9, 2012, through the present, Defendant Nicklas served as the Acting Director of Police and Public Safety and then Vice President for Public Safety and Community Relations for NIU. All actions alleged in this Complaint to have been taken by Defendant Nicklas were taken under color of state law within the meaning of 42 U.S.C. § 1983. Defendant Nicklas is being sued in this matter in his individual capacity.

9.  Defendant Steven Cunningham is an adult resident of the State of Illinois. At all times relevant to this complaint, Defendant Cunningham was the Vice President for Administration and Human Resources for NIU. All actions alleged in this Complaint to have been taken by Defendant Cunningham were taken under color of state law within the meaning of 42 U.S.C. § 1983. Defendant Cunningham is being sued in this matter in his individual capacity.

10.  Defendant Jerry D. Blakemore is an adult resident of the State of Illinois. At all times relevant to this Complaint, Defendant Blakemore was Vice President and General Counsel of NIU. All actions alleged in this Complaint to have been taken by

Defendant Blakemore were taken under color of state law within the meaning of 42 U.S.C. § 1983. Defendant Blakemore is being sued in this matter in his individual capacity.

11. Defendant Debra Boughton is an adult resident of the State of Illinois. At all times relevant to this complaint, Defendant Boughton was the Associate Athletics Director at NIU. All actions alleged in this Complaint to have been taken by Defendant Boughton were taken under color of state law within the meaning of 42 U.S.C. § 1983. Defendant Boughton is being sued in this matter in her individual capacity.

12. Defendant Katherine Little is an adult resident of the State of Illinois. At all times relevant to this complaint, Defendant Little was employed by NIU as the Lab Manager of the Center for Government Studies. All actions alleged in this Complaint to have been taken by Defendant Little were taken under color of state law within the meaning of 42 U.S.C. § 1983. Defendant Little is being sued in this matter in her individual capacity.

13. Defendant Randi Napientek is an adult resident of the State of Illinois. At all times relevant to this Complaint, Defendant Napientek was the Assistant Director of Student Academic Success at NIU. All actions alleged in this complaint to have been taken by Defendant Napientek were taken under color of state law within the meaning of 42 U.S.C. § 1983. Defendant Napientek is being sued in this matter in her individual capacity.

14. Defendant Jonathan Ostenburg is an adult resident of the State of Illinois. At all times relevant to this Complaint, Defendant Ostenburg was employed by NIU as an

ITS Application Software Support Analyst. All actions alleged in this Complaint to have been taken by Defendant Ostenburg were taken under color of state law within the meaning of 42 U.S.C. § 1983. Defendant Ostenburg is being sued in this matter in his individual capacity.

15. Defendant Michael Stang is an adult resident of the State of Illinois. At all times relevant to this Complaint, Defendant Stang was the Executive Director of Housing and Dining at NIU. All actions alleged in this Complaint to have been taken by Defendant Stang were taken under color of state law within the meaning of 42 U.S.C. § 1983. Defendant Stang is being sued in this matter in his individual capacity.

### III. FACTUAL ALLEGATIONS

16. Prior to his termination on February 19, 2013, Grady was employed by NIU as its Chief of Police and Public Safety ("Chief of Police").

17. Plaintiff was employed in this position pursuant to a Letter of Agreement dated May 23, 2008 ("Letter of Agreement"), which constituted a binding contractual agreement between Plaintiff and NIU. A true and correct copy of this Letter of Agreement is attached to this Complaint as "Exhibit A" and is incorporated here by reference.

18. Plaintiff was initially employed for a four-year term ending on June 30, 2012, which was automatically renewed in mid-2010, pursuant to the terms of the Letter of Agreement, for a new four-year term ending on June 30, 2014.

19. The Letter of Agreement provided that Plaintiff's employment could be terminated by NIU prior to the end of the current four-year term only for "just cause,"

which included deliberate or intentional and/or serious violations of legal standards by the Plaintiff, University rules and regulations, or Plaintiff's contractual duties and responsibilities. Violations of NIU policies and rules by Plaintiff's subordinates was specifically excluded as constituting just cause for termination of his Letter of Agreement.

20.  Until November 9, 2012, Plaintiff reported to and was supervised by Eddie Williams, NIU's Executive Vice President and Chief of Operations. After that date, Plaintiff was supervised by Defendant F. William Nicklas, who was appointed Acting Director of Police and Public Safety for NIU on that same date.

21.  In November 2011, Andrew Rifkin, a sworn officer of the NIU Police Department (NIUPD), admitted that he had had sexual relations with K.K., an NIU undergraduate, at Rifkin's apartment. K.K. filed a complaint with the NIUPD alleging that the encounter had been consensual at first but that Rifkin had then forcibly continued it after K.K. had repeatedly asked him to stop.

22.  Rifkin corroborated K.K.'s complaint in a signed statement describing their sexual encounter. Based on K.K.'s complaint and Rifkin's own corroborating statement, De Kalb County State's Attorney Clay Campbell obtained a grand jury indictment of Rifkin on December 23, 2011, on charges of criminal sexual assault. Rifkin was also terminated from the NIUPD for violating department rules, including the rule that his sexual relationship with a coed, even if consensual, was prohibited.

23.  Following Rifkin's arrest, two female NIU undergraduates, I.D. and V.M., came unannounced to the NIUPD asking to speak to Grady. After voicing general

support for Rifkin, the students told Plaintiff that, while they had not personally witnessed Rifkin's encounter with K.K., they believed that it had been entirely consensual.

24. Hearing that, Grady stopped the conversation and urged the students to make formal written statements in Rifkin's case, which they reluctantly agreed to do. Pursuant to NIUPD standard operating procedure, Plaintiff then turned the students over to NIUPD Lieutenant Kartik Ramakrishnan, who was in charge of the Rifkin investigation, to take formal statements from them in a separate meeting.

25. Ramakrishnan believed that the two students were coming forward to provide information relevant to Rifkin's termination by NIU and not the criminal matter. Ramakrishnan did not believe that the students' statements refuted the criminal charge that the sexual encounter between Rifkin and K.K. had become non-consensual after K.K. had told Rifkin to stop or that the information from either I.D. or V.M. contradicted the confession by Rifkin on which that criminal charge was based.

26. After taking the statements, therefore, Ramakrishnan gave I.D. and V.M. each a copy of their statement and advised them that if they had any information regarding the criminal matter they were welcome to bring it forward.

27. Ramakrishnan then placed the statements in Rifkin's personnel file rather than in the Department's criminal investigation file, and he did not complete a police report reflecting Plaintiff's or his own interactions with the students or his having taken written statements from them. Plaintiff Grady was unaware of this conduct by Ramakrishnan.

28. In May 2012, NIU hired a private attorney to investigate allegations of improper and possibly criminal conduct by NIU officials Robert Albanese and John Gordon. That investigation did not involve the NIUPD or any other law enforcement agency nor was it initially reported to NIUPD or any other law enforcement investigative agency.

29. Albanese and Gordon remained on duty for the duration of the investigation. On July 19 and 20, 2012, Albanese was allowed to retire from his position at NIU with $45,000 in severance pay, and Gordon was allowed to resign with severance of over $36,000. Both Albanese and Gordon were also placed on paid administrative leave until July 31, 2012. Both Albanese and Gordon are Caucasian.

30. On August 3, 2012, in response to press reports that NIU Materials Management personnel had been selling State-owned scrap material and retaining the profits for their own use in a private bank account called the "Coffee Fund," Grady was instructed by Executive VP Eddie Williams to conduct an investigation of the Coffee Fund and to give that investigation top priority. To dispel any suggestion of a University cover-up of its own officials' misconduct, Williams told Plaintiff to keep State's Attorney Campbell abreast of the investigation.

31. On August 4, 2012, NIU Vice President of University Relations Kathy Buettner was quoted in a press account claiming that the August 3 news stories were the first that NIU administrators had heard about the Coffee Fund and that "NIU takes the allegations very seriously."

32. The next day, at Plaintiff's suggestion, Executive VP Williams instructed

Plaintiff to perform investigations of Robert Albanese and John Gordon as well, for possible criminal activity arising from the "substantial acts of misconduct" for which they had by then been cited by the University's private investigator. Williams expressed concern about allegations of a University cover-up of that initial investigation and the retirement- and resignation-related payouts to Albanese and Gordon. Williams told Plaintiff that he should wait until the Coffee Fund investigation was completed to begin the investigations of Albanese and Gordon.

33. In anticipation of those investigations, Plaintiff requested that all records bearing on the initial investigation of Albanese's and Gordon's activities be provided to NIUPD by Williams and University Counsel Jerry Blakemore. After repeated requests, Plaintiff received only 30 pages of material, much of which consisted only of resignation and retirement agreements, and Grady was told by Blakemore that no other information existed.

34. On August 15, 2012, NIU ended the disciplinary proceedings seeking for-cause dismissal of Albanese and Gordon, which the University had initiated in response to the private investigators' findings of misconduct on their part. The effect of this cessation was to allow these officials' original retirement and resignation "for personal reasons" to remain in effect.

35. These actions engendered intense public controversy and media editorial comment questioning whether the University's disciplinary leniency and final payouts to Albanese and Gordon were an attempt to keep "serious and substantial allegations of misconduct" out of public view.

36. During August 2012, Plaintiff was repeatedly pressed by Williams and Blakemore to turn over the files of the NIUPD's Coffee Fund investigation. Plaintiff agreed with State's Attorney Campbell that the files should not be released to University officials, and Plaintiff warned them to stay away from the investigation in order to avoid the appearance of a cover-up.

37. Despite Plaintiff's warnings, however, NIU Controller Keith Jackson acted unilaterally to have the private Coffee Fund bank account closed, despite the fact that the NIUPD was monitoring the account and seeking a court order to freeze it. Jackson had the money in the account, including co-mingled private funds, placed into a University-controlled account.

38. Plaintiff responded by including the officials responsible for closing the account—Jackson, Williams, Blakemore and Defendant Steven Cunningham—as targets in the NIUPD investigation and having them interviewed by NIUPD investigators.

39. On September 4, 2012, after the Coffee Fund investigation was finished, Plaintiff had the complete case files for the investigation delivered to State's Attorney Campbell, who had voiced interest in the results of the investigation and had called for a State Police and/or Attorney General investigation into potential cover-ups by University officials.

40. In September 2012, Plaintiff also had the Coffee Fund investigation files delivered to the State of Illinois Office of the Executive Inspector General.

41. Plaintiff also met with investigators for the Illinois State Police to discuss the Coffee Fund investigation and showed them the case file and provided a complete

synopsis of the investigation.

42.  As a central part of his communications with each of these three agencies, Plaintiff was disclosing to them information gained from NIUPD's Coffee Fund investigation regarding activity of NIU employees and administrative units that Plaintiff reasonably believed and had reasonable cause to believe was in violation of Illinois law, rules, and regulations.

43. In September of 2012, Plaintiff received a letter from NIU's President, Defendant John Peters, demanding that Plaintiff turn over the Coffee Fund investigation files by the close of business. Plaintiff met with Peters and Defendant Blakemore and informed them that he would provide only an investigative summary, which was consistent with standard police procedure. Peters withdrew his demand for the complete files but was visibly displeased with Plaintiff and questioned his loyalty to the University.

44. On September 25, 2012, Plaintiff sent President Peters and Executive VP Williams a confidential NIUPD memo summarizing the Coffee Fund investigation. While the memo did not include information on the interviews of the NIU officials involved in closing the Coffee Fund bank account, the memo did disclose other information regarding activities that Plaintiff reasonably believed and had reasonable cause to believe to be in violation of Illinois law, rules, and regulations.

45.  In response to subpoenas from State's Attorney Campbell in September 2012, President Peters, Vice Presidents Williams and Cunningham, University Counsel Blakemore, and the University's private investigator provided Campbell with several

11

thousand pages of information related to Albanese's and Gordon's conduct. These officials had not provided that same information, however, when it was requested by Plaintiff during NIUPD's own investigation of Albanese and Gordon, which formally commenced in early November 2012, and Plaintiff was forced to obtain the full records from the State's Attorney's Office.

46. On October 16, 2012, State's Attorney Campbell issued arrest warrants in connection with the Coffee Fund matter for Albanese and eight other NIU employees, including NIU Controller Keith Jackson. The eight others were placed on administrative leave a week after being arrested. All eight of these other employees are Caucasian.

47. In late October 2012, the attorneys defending Andrew Rifkin in his criminal prosecution by State's Attorney Campbell claimed they had not been provided with the statements taken from the two NIU students by NIUPD Lieutenant Ramakrishnan in late 2011. Claiming that the statements would have exonerated him, Rifkin subpoenaed the statements and moved to dismiss the criminal charges against him as a sanction for a purported *Brady* violation by the prosecution.

48. At the time the Rifkin attorneys made this claim they had already been aware of the information and statements provided to NIUPD by the students I.D. and V.M. for nearly a year, as a result of their investigator having interviewed I.D. and V.M. in December 2011 and January 2012. Thus the statements had been accessible to the criminal defendant through the witnesses themselves, who had been given copies of their statements by Ramakrishnan at the time they were taken and who could have requested another copy had they been asked to do so.

49.  Plaintiff Grady learned of Rifkin's motion to dismiss and immediately asked Lt. Ramakrishnan about the two students' statements. Ramakrishnan told Plaintiff for the first time that he had mistakenly filed the statements in Rifkin's personnel file and thus inadvertently neglected to provide them to the State's Attorney's Office for possible disclosure. Until Rifkin's motion to dismiss was filed, Plaintiff had been entirely unaware that the statements had not been disclosed to the defense as a result of Ramakrishnan's actions.

50. At a November 2, 2012, hearing on Rifkin's motion, Circuit Court Judge Robbin Stuckert ruled that there had been an intentional withholding of information by Lt. Ramakrishnan. When Judge Stuckert made this ruling, she had not been informed by Rifkin's attorneys that they had learned about the statements by I.D. and V.M. in December 2011 and January 2012.

51.  Judge Stuckert made no finding that Plaintiff was in any way personally responsible for the withholding of evidence or that Plaintiff knew anything about the fact that the evidence had not been transferred. No evidence was presented to Judge Stuckert on which she could have based such a finding regarding Plaintiff.

52. On November 5, 2012, State's Attorney Campbell issued a news release asserting that the NIUPD's actions had "jeopardized Rifkin's defense and the police department's credibility," and calling for an investigation of both the NIUPD and Plaintiff Grady. At the same time, a University Relations representative stated publicly that Defendant Peters was asking the Illinois State Police to assist in the review and completion of ongoing University Police investigations.

53. In the regular election held the next day, Tuesday, November 6, 2012, State's Attorney Campbell lost his bid for re-election to that office, to Richard Schmack.

54. On that same day, Lt. Ramakrishnan underwent a polygraph examination in which he was found to have answered truthfully that he had not purposefully put the I.D. and V.M. statements in Rifkin's personnel file to intentionally hide them from the State's Attorney, and that he had not knowingly hidden any information on Rifkin's case from the State's Attorney.

55. On November 7, 2013, all of the Sergeants serving under Plaintiff Grady at the NIUPD released a public letter stating that they were "dismayed by the allegations of intentional wrongdoing and misconduct" against Grady and Ramakrishnan. The letter asserted that Grady had been "subjected to baseless allegations of . . . engaging in acts of misconduct by people outside of this agency, some motivated by political agendas." The letter also asserted that Ramakrishnan's actions had been an unintentional mistake and stated explicitly that the polygraph examination he had voluntarily undergone had shown that "he neither acted intentionally nor maliciously to suppress evidence."

56. Defendant Nicklas took steps to restrain and suppress the ideas, opinions and evidence expressed in this letter by suspending the sergeant who had released it and instructing or causing the sergeants to be told they were not to disseminate or publish these ideas, opinions and evidence to the public or Plaintiff.

57. On Friday, November 9, 2012, Judge Stuckert refused Rifkin's motion to dismiss the criminal charge against him because the statements of I.D. and V.M. had

14

been improperly withheld from the defense.

58. After Judge Stuckert's ruling denying dismissal of the Rifkin criminal case on November 9, 2012, and in accordance with standard operating procedure and his authority and responsibilities as Chief of Police, taking all of the evidence he had methodically gathered into consideration per his duty to do so, including the polygraph to which Lt. Ramakrishnan had submitted and the ruling of the court on sanctions, Plaintiff issued a written reprimand to Lt. Ramakrishnan for mishandling evidence and violating accepted NIUPD policies.

59. On November 9, 2012, for reasons not made known to Plaintiff, Eddie Williams was relieved of responsibility for NIU's Department of Police and Public Safety, and Defendant F. William Nicklas was appointed acting "Director of Police and Public Safety," reporting directly to Defendant Peters.

60. At 7:30 that evening, Nicklas ordered Plaintiff to meet him the next morning, on Saturday, November 10, 2012. Prior to and during the phone conversation with Nicklas, neither Nicklas nor anyone else from NIU told plaintiff why Nicklas had been appointed as acting Director or suggested to Plaintiff that Nicklas's appointment had anything to do with the documents misfiled by Ramakrishnan or Plaintiff's consideration of appropriate discipline for Ramakrishnan.

61. At the scheduled meeting on Saturday, Nicklas abruptly informed Plaintiff that he was being placed immediately on administrative leave with pay. Nicklas gave Plaintiff no opportunity to respond to this decision or to present argument or evidence in his own defense.

62. At the Saturday meeting in which he placed Plaintiff on administrative leave, Nicklas made no mention of and asked no questions about the discipline of Ramakrishnan for not producing the witness statements in a timely manner.

63. Defendants' abrupt imposition of this suspension without any notice, explanation, or opportunity to respond was contrary to the University's own procedures and in direct contrast to the substantially more favorable treatment the University regularly accorded in practice to similarly situated employees who were Caucasian.

64. Nicklas informed Plaintiff that he had been stripped of all police powers and ordered him to surrender his badge and weapon immediately. Nicklas told Plaintiff that he was banned from the NIU campus and instructed him to clean out his office and have no contact with any NIUPD personnel or any University administrator.

65. On that same day, Defendant Nicklas issued a news release announcing that Plaintiff had been placed on administrative leave "pending finalization of charges and disciplinary actions" against him. The release quoted Peters as saying that "[t]he findings of the [Rifkin] court called into question the integrity of the criminal investigatory process, and we cannot under any circumstances tolerate such clear breaches of contracts, authority and responsibility," intentionally communicating to the public the uninvestigated allegations against Plaintiff as if they had been found to be factually true.

66. Plaintiff also received a letter confirming his suspension on Defendant Peters' letterhead, dated November 10, 2012, and signed by Defendant Nicklas. The

letter informed Plaintiff that the University would initiate proceedings to terminate him for "just cause" based on his purported "actions" in the "failure of the Police Department to make mandatory *Brady* disclosures" in the Rifkin prosecution, which the letter said constituted "deliberate and/or serious violations of your duties and responsibilities" under Plaintiff's Letter of Agreement and University rules and regulations.

67. The letter referred to in the preceding paragraph made no mention of Plaintiff's discipline or failure to discipline Ramakrishnan appropriately as a potential "just cause" basis for terminating Plaintiff's contract.

68. Plaintiff's precipitate suspension and the statements about it in Peters' release and Nicklas' letter on November 10, 2012, received wide publicity and adverse editorial comment in local and regional newspapers and other media, including the Chicago press.

69. Defendants, in handling Plaintiff's suspension and discipline more harshly than similarly situated white employees, as set forth above, discriminated against Plaintiff because of his race and retaliated against Plaintiff because he had disclosed information from his Coffee Fund investigation regarding activity of NIU employees and administrative units that Plaintiff reasonably believed and had reasonable cause to believe was in violation of Illinois law, rules, and regulations to the DeKalb County State's Attorney, the Illinois Office of the Executive Inspector General, and the Illinois State Police.

70. Each of Defendants Nicklas, Peters, Cunningham, and Blakemore

participated in the decision to suspend and discipline Plaintiff in the manner set forth above.

71.  After suspending Plaintiff on November 10, 2012, Defendant Nicklas moved into Plaintiff's office as the newly appointed acting "Director of Police and Public Safety." On the same day, Nicklas appointed Deputy Chief Darren Mitchell to be Acting Chief of the NIUPD and suspended Lt. Ramakrishnan on the same terms as Plaintiff.

72.  On November 12, 2012, Nicklas informed NIUPD's administrative staff and supervisors that Plaintiff and Ramakrishnan had been suspended indefinitely, that Nicklas was taking over and that the investigations Plaintiff had directed related to 1) Robert Albanese, 2) John Gordon, 3) Kris Gordon, 4) the Redemption Fund, and 5) the Coffee Fund would be closed.

73.  At a meeting later the same day, Acting Chief Mitchell warned the evening shift NIUPD staff against any contact with Plaintiff and stated that Chief Grady would not be coming back.

74.  These actions by Defendant Nicklas and Acting Chief Mitchell were contrary to the University's own procedures and in direct contrast to the substantially more favorable treatment the University regularly accorded in practice to similarly situated employees who were Caucasian.

75.  On November 17, 2012, a Chicago Tribune story reported that Defendant Peters had stated in an interview that he had suspended Plaintiff and banned him indefinitely from the NIU campus because the University "cannot under any circumstances tolerate such clear breaches of contracts, authority and responsibility."

18

The Tribune story added that the NIU Office of Public Relations had told the paper that "Grady . . . is not expected to return to the job."

76. The highly public statements by Defendant Peters and other University officials explicitly affirming wrongdoing by Plaintiff and a determination to terminate his employment in advance of any investigation or opportunity to defend against unproven allegations of serious misconduct, as set forth above, were contrary to the University's own procedures and in direct contrast to the substantially more favorable treatment the University regularly accorded in practice to similarly situated employees who were Caucasian.

77. Outgoing State's Attorney Campbell moved to dismiss the criminal charges against Andrew Rifkin, without prejudice, on November 27, 2012.

78. On November 28, 2012, Plaintiff received a written statement of the charges for which NIU was "considering disciplinary action" against him. These consisted of general assertions about Plaintiff's own purported misconduct and his "supervision" of others' misconduct regarding the Rifkin witness statements and about Plaintiff's purported "deletion" or "copying" of files from his work computer before being placed on leave.

79. The November 28, 2012, letter referred to in the preceding paragraph made no mention of Plaintiff either having failed to discipline or inappropriately disciplining Ramakrishnan as a basis for Plaintiff being considered for disciplinary action.

80. The letter asserted that the potential infractions it did mention were being "investigated" and said nothing about any actual evidence on which they were

purportedly based. The letter cited no evidence that Plaintiff knew of or condoned the failure of Lt. Ramakrishnan to forward the witness statements to the Rifkin prosecution.

81. On January 9, 2013, Defendant Nicklas notified Plaintiff by letter that NIU intended to "initiate action to terminate" Plaintiff's employment based on the charges set forth in the University's November 28, 2012, statement of charges. The letter stated that Plaintiff could request an "informal," "pre-termination meeting" with Nicklas at which Plaintiff would be allowed to "discuss the charges" against him and "present any information" Plaintiff believed may be "relevant to the decision-making process." The letter said nothing about any actual evidence on which the charges against him were purportedly based.

82. The January 9, 2013, letter made no mention of any alleged inappropriate discipline, failure to discipline or "sham" discipline of Lt. Ramakrishnan as a charge against Plaintiff that was either being investigated or used as a basis to discipline Plaintiff.

83. In response to Nicklas' letter, Plaintiff requested a "pre-termination meeting," which was scheduled for February 1, 2013. Prior to that meeting, Plaintiff received no further communication from NIU regarding the specific conduct for which he was being charged and disciplined or the evidence on which those charges were purportedly based.

84. On January 31, 2013, Plaintiff wrote a letter to Defendant Nicklas objecting to the lack of specificity in the charges made against him by NIU and the lack of clarification of those charges by NIU in response to Plaintiff's previous requests, and

attaching information in response to the charges in their current form.

85. Plaintiff's letter also stated: "I continue to be greatly concerned that the severe action the University appears intent on taking is not related to some fault or impropriety on my part, but rather is based on unjust, illicit, discriminatory, and/or retaliatory considerations."

86. At the "pre-termination meeting" on February 1, 2013, Nicklas informed Plaintiff that the University had "substantially completed its review" and was "considering" disciplinary action based on its "preliminary findings." Nicklas said that he would "briefly summarize the types of evidence which the University believes supports these charges" and give Plaintiff an opportunity to "present information or mitigating circumstances" before possible disciplinary action was taken.

87. In his recitation, Nicklas said nothing about a failure to discipline Ramakrishnan, an inappropriate discipline of Ramakrishnan or a "sham" discipline of Ramakrishnan as a basis for disciplining Plaintiff.

88. Nicklas told Plaintiff that his attorney could be present but that only Plaintiff could speak. Nicklas said there would be no "debate or discussion" and that any "questions" or comments Plaintiff offered would be "taken under consideration" and "may be addressed" by Nicklas in a subsequent written response.

89. During the ensuing meeting, Defendant Nicklas only recited the charges against Plaintiff and listed a series of documents that would be made available to Plaintiff after the meeting, but Nicklas did not state or summarize the actual content of such documents or indicate in any way how that or any other purported "evidence"

was alleged to have supported the charges against Plaintiff.

90. In response to Nicklas' invitation to ask questions during the meeting, Plaintiff specifically asked Nicklas to properly present and describe the particular conduct or evidence NIU had that would support an allegation that Plaintiff knew about the misfiled statements and had authorized, ratified or condoned the misfiling of those statements, to which Nicklas responded that he would not answer that question.

91. On February 3, 2013, Plaintiff sent a letter to Defendant Nicklas again questioning and opposing what he perceived to be Defendants' racially discriminatory and retaliatory treatment of him and of other minorities he specified, compared to the markedly more lenient treatment accorded by the University to Albanese, Gordon, and the eight other materials management employees implicated in the Coffee Fund matter, despite their having engaged in misconduct far more certain and serious than that alleged against Plaintiff.

92. On February 19, 2013, Defendant Nicklas sent Plaintiff a letter terminating his employment by NIU. The stated bases for Plaintiff's termination were the purported failure of the NIUPD to turn over "exculpatory 'Brady' evidence" in the Rifkin prosecution and Plaintiff's purported failure "to appropriately supervise" the Department.

93. In his termination letter, Nicklas stated: "I do not believe there was merely a mistaken withholding of evidence on the part of the Department in the *Rifkin* case. Moreover, I do not find credible your claim that you were not involved in the purposeful withholding of exculpatory evidence. . . . I find that you knew, or should

have known, about all or most of this conduct. I further find that it is more probable than not that you either ordered, encouraged, and/or condoned much or all of it, or that you were indifferent to upholding the regular procedures of the Department in this case, or that you were negligent in your supervisory duties." Nicklas had no evidence to support his conclusions, but rather relied exclusively on what he claimed to be his "beliefs" and unsupported inferences.

94. The termination letter also purported to set forth, for the first time, the "evidence" on which Nicklas and the University had allegedly relied in making the termination decision. None of that "evidence" showed that the Chief knew of or condoned Lt. Ramakrishnan's failure to forward the witness statements, nor did any of the evidence suggest a motive on Ramakrishnan's or Plaintiff's part for withholding the statements.

95. Nor did the termination letter mention any "sham" discipline, failure to discipline or inappropriate discipline of Ramakrishnan as a basis for terminating Plaintiff's contract.

96. Prior to making their decision to terminate Plaintiff's employment, Defendants Nicklas, Peters, Cunningham, and Blakemore were also fully aware of the fact that Lt. Ramakrishnan had already passed a polygraph examination in which he had truthfully denied any purposive withholding of exculpatory material in the Rifkin criminal case, and that there had thus been no such conduct for Plaintiff to have known of, ordered, encouraged, condoned or otherwise been involved with.

97. Defendants terminated Plaintiff in the manner set forth above because of his

23

race and in retaliation for opposing unlawful discrimination and in retaliation for disclosing information from his investigations regarding activity of NIU employees and administrative units that Plaintiff reasonably believed and had reasonable cause to believe was in violation of Illinois law, rules, and regulations to the DeKalb County State's Attorney, the Illinois Office of the Executive Inspector General, and the Illinois State Police.

98. Each of Defendants Nicklas, Peters, Cunningham, and Blakemore participated in the decision to terminate Plaintiff in the manner set forth above.

99. The reasons given by the named Defendants were not credible, and were a pretext for discriminating against Plaintiff on the basis of his race and for retaliating against Plaintiff based on his complaint of racial discrimination and the other protected activity set forth below.

100. Plaintiff's termination and the specific grounds for that decision set forth in Nicklas' termination letter received wide publicity and adverse editorial comment in the media.

101. News accounts about Plaintiff's termination quoted or described Nicklas' statements in the termination letter disparaging Plaintiff's honesty and integrity, including Nicklas' assertions, with absolutely no factual basis, that he did not find Plaintiff's denials of direct involvement in the purposeful non-disclosure of witness statements to Rifkin to be "credible," that Plaintiff "knew or should have known" that those witness statements had not been disclosed and had likely "ordered, encouraged, and/or condoned" that conduct, and that "your breach of contract has damaged

irreparably the trust that must exist between the University and its Chief of Police." These charges were totally false and speculative and did not, as such, form lawful cause to terminate Plaintiff's contract.

102. Defendants' decisions to suspend and isolate Plaintiff from his position as Chief before investigating any actual misconduct on his part and to terminate him based on NIU's false but widely publicized claims of personal dishonesty, intentional rule violations, and administrative incompetence, as set forth above, have had a devastating impact on Plaintiff's reputation and career and rendered him unemployable as a sworn law enforcement officer at any level.

103. On February 22, 2013, Andrew Rifkin was re-indicted by the newly elected State's Attorney, Richard Schmack, on the criminal rape charges that had originally been brought against him and later dismissed by then-State's Attorney Campbell .

104. At the time State's Attorney Schmack made the decision to re-indict Rifkin, he was in possession of the purportedly "exculpatory" statements by NIU students I.D. and V.M. He also had possession of the victim's statement accusing Rifkin and Rifkin's confession to forcing sex after the victim had told him to stop.

105. Article 11 of NIU's Constitution & Bylaws sets forth the University's internal grievance procedure ("Grievance Procedure").

106. On March 26, 2013, Plaintiff filed a grievance pursuant to Step I of the Grievance Procedure. In that grievance and a supporting letter sent on April 4, 2013, Plaintiff again protested that he had been treated far more harshly than Caucasian employees similarly or less favorably situated than he and that he had been

discriminated against because of his race and retaliated against for opposing such discrimination and retaliation.

107. On or about March 29, 2013, at a pre-termination conference for Lt. Ramakrishnan with NIU representatives, Ramakrishnan was offered favorable treatment with regard to his discipline if he would support the allegation that Plaintiff did know or should have known that Ramakrishnan did not pass on the statements from I.D. and V.M. to the prosecutor. Ramakrishnan refused to accept the proposed deal because to testify as NIU officials were requesting would be to testify falsely.

108. This offer by Defendants to retain an employee who had admitted to misfiling evidence as a means to induce him to falsely implicate an innocent employee was unprecedented at NIU, in contravention of accepted NIU policies, practices and procedures, and in sharp contrast to the substantially more favorable treatment the University accorded in practice to similarly situated employees who were Caucasian and/or who had not complained of racial discrimination.

109. On April 17, 2013, Defendant Nicklas responded by letter, denying Plaintiff's grievance. The parties then stipulated to bypass Step II of the Grievance Procedure, and Plaintiff submitted his Request for Grievance Committee Hearing pursuant to Step III of the Grievance Procedure. In that Request, Plaintiff once again renewed his complaint of unlawful racial discrimination and retaliation against him and other NIU employees by Defendants.

110. Section 11.5.3.2(g) of the Grievance Procedure gives the Grievance Committee formed in response to a Step III request for hearing the option to grant or

deny the request.

111.  The NIU Grievance Procedure provides that the Committee "will grant the request for a hearing if it determines there are sufficient grounds and if the grievance issues have not been adequately resolved," but no standards for making these determinations are stated and the grievant is not allowed any input into the decision whether to grant or deny the requested hearing. A decision by the Grievance Committee to deny a hearing terminates the grievance process and the grievant cannot get a hearing under NIU rules.

112.  Defendants Debra Boughton, Katherine Little, Randi Napientek, Jonathon Ostenburg, and Michael Stang were appointed to serve as the Grievance Committee for Plaintiff's grievance.

113.  On July 12, 2013, Plaintiff received an email informing him that, pursuant to § 11.5.3.2(g), his request for a hearing was denied and that this decision concluded NIU's action on Plaintiff's grievance. Plaintiff was given no explanation of Defendants' decision to deny him a full hearing.

114.  While this arbitrary and unexplained denial of a full hearing regarding Plaintiff's suspension and termination by Defendants was permitted by the University's rules and was therefore neither random nor unauthorized, the denial of any hearing in this manner by Defendants was in stark contrast to the substantially more favorable treatment the University accorded in practice to similarly situated employees who were Caucasian and/or who had not complained of race discrimination.

115.  In April 2013, NIU commenced formal termination proceedings against Lt.

Ramakrishnan based on the written charges of misconduct in his handling of the witness statements from I.D. and V.M. in the Rifkin prosecution.

116. After a full hearing in June 2013, at which NIU presented its purported "evidence" that Ramakrishnan had purposively withheld the statements from proper disclosure, the University Civil Service Merit Board issued its final decision on September 10, 2013, ruling that the evidence produced did not support or sustain one or more of the University's charges and that any charges proven by the University failed to establish just cause for Ramakrishnan's discharge. The decision granted Ramakrishnan's motion to dismiss and ordered that he be immediately reinstated without loss of compensation.

117. At no time did Nicklas or NIU have competent evidence to show that Plaintiff was responsible for any violations of policy that would justify his termination but, unlike Ramakrishnan, Plaintiff was never given a hearing at which the University was required to produce evidence supporting their unfounded charges before an impartial body so that it could be examined by neutral officials with no discriminatory or retaliatory agenda.

## COUNT I

### (Race Discrimination – Title VII)

1. For a first cause of action, against Defendant Board of Trustees of Northern Illinois University for discrimination in violation of Title VII, plaintiff realleges each of the preceding paragraphs 1-117 as though set forth here.

2.   By engaging in the conduct described in the preceding paragraphs, including but not limited to suspending and terminating Plaintiff from his position as Chief of the NIUPD because of his race, and doing so in a manner substantially more aggressive, onerous, and injurious than for Caucasian employees charged with far more serious misconduct, as set forth above, Defendant Board unlawfully discriminated against plaintiff in violation of Title VII.

3.   Defendant Board's unlawful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Plaintiff will continue to suffer these damages in the future.

## COUNT II

### (Retaliation – Title VII)

1.   For a second cause of action, against Defendant Board of Trustees of Northern Illinois University for retaliation in violation of Title VII, Plaintiff realleges each of the preceding paragraphs 1-117 as though set forth here.

2.   As set forth in the preceding paragraphs, Grady engaged in activity protected from retaliation under Title VII, including but not limited to repeatedly, both orally and in writing, reporting and opposing unlawful racial discrimination against him and unlawful retaliation for doing so to NIU officials, and complaining of such discrimination and retaliation in his written grievance submissions.

3. By engaging in the conduct described in the preceding paragraphs, including but not limited to suspending and terminating Plaintiff in the manner set forth above because of his having engaged in such protected activity, Defendant Board unlawfully retaliated against plaintiff in violation of Title VII.

4. Defendant Board's unlawful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Plaintiff will continue to suffer these damages in the future.

## COUNT III

**(Race Discrimination – Equal Protection Clause and §§ 1981 and 1983)**

1. For a third cause of action, brought through 42 U.S.C. § 1983 against Defendants Peters, Nicklas, Cunningham, and Blakemore in their individual capacities, and against Defendant Board for purposes of injunctive relief only, for discrimination in violation of the Equal Protection Clause and 42 U.S.C. § 1981, Plaintiff realleges each of the preceding paragraphs 1-117 as though set forth here.

2. By engaging in the conduct described in the preceding paragraphs, including but not limited to suspending and terminating Plaintiff from his position as Chief of the NIUPD because of his race, and doing so in a manner substantially more aggressive, onerous, and injurious than for Caucasian employees charged with far more serious misconduct, as set forth above, the Defendants named above unlawfully discriminated

against Plaintiff in violation of the Equal Protection Clause of the 14th Amendment to the U.S. Constitution and 42 U.S.C. §§ 1981 and 1983.

3. Said Defendants' unlawful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Plaintiff will continue to suffer these damages in the future.

4. Said Defendants' unlawful conduct, as alleged above, was intentional and undertaken with malice and reckless indifference to Plaintiff's rights under the Equal Protection Clause and 42 U.S.C. §§ 1981 and 1983, and Plaintiff therefore seeks awards of punitive damages against these Defendants in order to deter them and others similarly situated from such wrongful conduct in the future.

## COUNT IV

### (Retaliation – § 1981)

1. For a fourth cause of action, brought through 42 U.S.C. § 1983 against Defendants Peters, Nicklas, Cunningham, and Blakemore in their individual capacities, and against Defendant Board for purposes of injunctive relief only, for retaliation in violation of 42 U.S.C. § 1981, Plaintiff realleges each of the preceding paragraphs 1-117 as though set forth here.

2. As set forth in the preceding paragraphs, Grady engaged in activity protected from retaliation under § 1981, including but not limited to repeatedly, both orally and in writing, reporting and opposing unlawful racial discrimination against him and

31

unlawful retaliation for doing so to NIU officials, and complaining of such discrimination and retaliation in his written grievance submissions.

3. By engaging in the conduct described in the preceding paragraphs, including but not limited to suspending and terminating Plaintiff in the manner set forth above because of his having engaged in such protected activity, Defendants named above unlawfully retaliated against Plaintiff in violation of 42 U.S.C. §§ 1981 and 1983.

4. Said Defendants' unlawful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Plaintiff will continue to suffer these damages in the future.

5. Said Defendants' unlawful conduct, as alleged above, was intentional and undertaken with malice and reckless indifference to Plaintiff's rights under 42 U.S.C. §§ 1981 and 1983, and Plaintiff therefore seeks awards of punitive damages against these Defendants in order to deter them and others similarly situated from such wrongful conduct in the future.

## COUNT V

### (Denial of Procedural Due Process – Due Process Clause and § 1983)

1. For a fifth cause of action, brought through 42 U.S.C. § 1983 against Defendants Peters, Nicklas, Cunningham, Blakemore, Boughton, Little, Napientek, Ostenburg, and Stang in their individual capacities, and against Defendant Board for

purposes of injunctive relief only, for violations of the Due Process Clause, Plaintiff realleges the preceding paragraphs 1-117 as though set forth here.

2.  Plaintiff Grady held a constitutionally protected property interest in not being suspended or terminated from his position as Chief of the NIUPD arising from the contractually binding promise by NIU, as set forth above, that Plaintiff would not be deprived of that position except for specifically and narrowly delimited reasons constituting just cause as set forth in his Letter of Agreement with NIU.

3.  Said Defendants deprived Plaintiff of this property interest in his continued employment as Chief of the NIUPD by causing and confirming his suspension and termination from that position, as set forth above. Both Plaintiff's abrupt and onerous suspension from his position as Chief and his subsequent termination from that position caused Plaintiff to suffer direct and indirect economic loss by causing him to lose other tangible employment opportunities and by making it virtually impossible for him to find employment in any law enforcement position.

4.  Plaintiff Grady held a constitutionally protected liberty interest in his ability to continue seeking and obtaining future employment in the occupation, calling and profession—the performance and management of all phases of public law enforcement work as a sworn officer—to which he has chosen to devote his working life and in which he had already invested substantial time, resources and effort to gain the education, training and experience needed to succeed.

5. Said Defendants deprived Plaintiff of this liberty interest by abruptly suspending Plaintiff Grady from his position as NIUPD Chief, banning him completely

from all functions, facilities and contact with personnel of his Department, and subsequently causing and confirming Plaintiff's termination from that position, in the highly public circumstances and manner set forth above, and by repeatedly making and publicly disseminating false, unfounded and highly damaging statements about purported unprofessional, unethical, and unlawful conduct by Plaintiff and about the purported reasons for the suspension, investigation, and termination of his employment, as set forth above, thereby publicly stigmatizing Plaintiff and impugning his personal and professional reputation, character, and integrity in a manner that has caused him to lose other tangible employment opportunities and made it virtually impossible for him to find employment in his field and thereby effectively excluded him from his chosen occupation and career.

6.   By engaging in the conduct described in the preceding paragraphs, including but not limited to: 1) suspending Plaintiff and placing him on administrative leave without prior investigation, notice of charges, or opportunity to respond and with a settled intent to terminate him for unlawful reasons; 2) terminating Plaintiff's employment with NIU for those unlawful reasons after affording him only defective and inadequate pre-termination process in which the specific misconduct with which he was being charged was never properly stated, the purported evidence against him was not timely or fully produced, and no actual hearing occurred at which Plaintiff could properly confront and contest the arguments and evidence against him and present evidence and argument in his own defense; and 3) after Plaintiff's termination, denying him any adversarial hearing process, either in the University's grievance process or

34

otherwise, in which Plaintiff was given the opportunity to confront and contest the arguments and evidence against him and present evidence and argument in his own defense, said Defendants unlawfully deprived Plaintiff of his constitutionally protected property and liberty interests, as set forth above, without procedural due process in violation of his rights under the Due Process Clause of the 14th Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

7. Said Defendants' unlawful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Plaintiff will continue to suffer these damages in the future.

8. Said Defendants' unlawful conduct, as alleged above, was intentional and undertaken with malice and reckless indifference to Plaintiff's rights under the Due Process Clause and 42 U.S.C. § 1983, and Plaintiff therefore seeks awards of punitive damages against these Defendants in order to deter them and others similarly situated from such wrongful conduct in the future.

## COUNT VI

### (Denial of Substantive Due Process – Due Process Clause and § 1983)

1. For a sixth cause of action, brought through 42 U.S.C. § 1983, against Defendants Peters, Nicklas, Cunningham, and Blakemore in their individual capacities and against Defendant Board for purposes of injunctive relief only, for violations of the

Due Process Clause, Plaintiff realleges the preceding paragraphs 1-117 as though set forth here.

2. Plaintiff Grady held a constitutionally protected property interest in not being suspended or terminated from his position as Chief of the NIUPD arising from the contractually binding promise by NIU, as set forth above, that Plaintiff would not be deprived of that position except for specifically and narrowly delimited reasons constituting just cause as set forth in his Letter of Agreement with NIU.

3. Said Defendants deprived Plaintiff of this property interest in his continued employment as Chief of the NIUPD by causing and confirming his suspension and termination from that position, as set forth above. Both Plaintiff's abrupt and onerous suspension from his position as Chief and his subsequent termination from that position caused Plaintiff to suffer direct and indirect economic loss by causing him to lose other tangible employment opportunities and by making it virtually impossible for him to find employment in any law enforcement position.

4. Plaintiff Grady held a constitutionally protected liberty interest in his ability to continue seeking and obtaining future employment in the occupation, calling and profession—the performance and management of all phases of public law enforcement work as a sworn officer—to which he has chosen to devote his working life and in which he had already invested substantial time, resources and effort to gain the education, training and experience needed to succeed.

5. Said Defendants deprived Plaintiff of this liberty interest by abruptly suspending Plaintiff Grady from his position as NIUPD Chief, banning him completely

from all functions, facilities and contact with personnel of his Department, and subsequently causing and confirming Plaintiff's termination from that position, in the highly public circumstances and manner set forth above, and by repeatedly making and publicly disseminating false, unfounded and highly damaging statements about purported unprofessional, unethical, and unlawful conduct by Plaintiff and about the purported reasons for the suspension, investigation, and termination of his employment, as set forth above, thereby publicly stigmatizing Plaintiff and impugning his personal and professional reputation, character, and integrity in a manner that has caused him to lose other tangible employment opportunities and made it virtually impossible for him to find employment in his field and thereby effectively excluded him from his chosen occupation and career.

6.   By depriving Plaintiff of his protected property and/or liberty interests in the manner set forth above, and by engaging in the other arbitrary, irrational and unlawful conduct described in the preceding paragraphs—including but not limited to causing and confirming the suspension and termination of Plaintiff's employment in a manner that publicly humiliated and falsely maligned him and destroyed his reputation and career without any opportunity to defend himself at a full and fair hearing, and in so doing treated him far more harshly because of his African-American race than numerous other, Caucasian employees accused of far worse conduct in violation of his statutory and constitutional rights, for the unlawful and improper purposes of interfering with, limiting, or precluding Plaintiff's conduct of lawful, independent investigations of potential criminal conduct by those and other employees and of

retaliating against Plaintiff both for opposing his racially discriminatory mistreatment by Defendants and for properly and lawfully resisting Defendants' attempts to impair his investigations and disclosing their content and results to law enforcement authorities and others, Defendants Peters, Nicklas, Cunningham, and Blakemore acted in a manner that shocks the conscience and denied Plaintiff's right to substantive due process under the Due Process Clause of the 14th Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

7.  The available state law remedies either do not exist or are inadequate to properly remedy the adverse public and personal damage done by Defendants' attempts to impair, subvert, and punish Plaintiff's lawful and proper criminal investigations and other law enforcement activities and to prevent and deter such injurious misconduct by Defendant(s) and others in the future.

8.  Said Defendants' unlawful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment.  Plaintiff will continue to suffer these damages in the future.

9.  Said Defendants' unlawful conduct, as alleged above, was intentional and undertaken with malice and reckless indifference to Plaintiff's rights under the Due Process Clause and 42 U.S.C. § 1983, and Plaintiff therefore seeks awards of punitive damages against these Defendants in order to deter them and others similarly situated from such wrongful conduct in the future.

## COUNT VII

### (Retaliation – Ethics Act)

1. For a seventh cause of action, against Defendants Peters, Nicklas, Cunningham, and Blakemore in their individual capacities for retaliation in violation of the Illinois State Officials and Employees Ethics Act, Plaintiff realleges the preceding paragraphs 1–117 as though set forth here.

2. As set forth in the preceding paragraphs, Grady engaged in protected activity within the meaning of the Ethics Act, including but not limited to disclosing information gained from NIUPD's "Coffee Fund" investigation and other investigations regarding activity of NIU employees and administrative units that Plaintiff reasonably believed was in violation of Illinois law, rules, and regulations to state agencies and state and local law enforcement agencies and prosecutorial offices and their employees, including the DeKalb County State's Attorney, the Illinois Office of the Executive Inspector General, and the Illinois State Police.

3. By engaging in the adverse conduct described in the preceding paragraphs, including but not limited to first suspending and then terminating Plaintiff from his employment at NIU in a manner that publicly humiliated and falsely maligned him and destroyed his reputation and career without any opportunity to defend himself at a full and fair hearing because Plaintiff had engaged in protected activity, as set forth above, Defendants Peters, Nicklas, Cunningham, and Blakemore unlawfully retaliated against Plaintiff in violation of the Illinois State Officials and Employees Ethics Act, 5 ILCS 430/1-1 et seq.

39

4. Said Defendants' unlawful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Plaintiff will continue to suffer these damages in the future.

5. Said Defendants' unlawful conduct, as alleged above, was intentional and undertaken with malice and reckless indifference to Plaintiff's rights under the Ethics Act, and Plaintiff therefore seeks awards of punitive damages against these Defendants in order to deter them and others similarly situated from such wrongful conduct in the future.

## COUNT VIII

### (Retaliation – Whistleblower Act)

1. For eighth cause of action, against Defendants Peters, Nicklas, Cunningham, and Blakemore in their individual capacities for retaliation in violation of the Illinois Whistleblower Act, Plaintiff realleges the preceding paragraphs 1-117 as though set forth here.

2. As set forth in the preceding paragraphs, Grady engaged in activities for which government employees are protected from retaliation by the Whistleblower Act, including but not limited to disclosing or attempting to disclose information gained from NIUPD's "Coffee Fund" investigation and other investigations regarding activity of NIU employees and administrative units that constituted public corruption or wrongdoing and that Plaintiff had reasonable cause to believe disclosed violations of

Illinois law, rules, and regulations to government or law enforcement agencies, including the DeKalb County State's Attorney, the Illinois Office of the Executive Inspector General, and the Illinois State Police.

3. By engaging in the adverse conduct described in the preceding paragraphs, including but not limited to first suspending and then terminating Plaintiff from his employment at NIU in a manner that publicly humiliated and falsely maligned him and destroyed his reputation and career without any opportunity to defend himself at a full and fair hearing because Plaintiff had engaged in the protected activity set forth above, Defendants Peters, Nicklas, Cunningham, and Blakemore unlawfully retaliated against Plaintiff in violation of the Illinois Whistleblower Act, 740 ILCS 174/1 et seq.

4. Said Defendants' unlawful conduct, as alleged above, caused Plaintiff substantial damages, including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Plaintiff will continue to suffer these damages in the future.

5. Said Defendants' unlawful conduct, as alleged above, was intentional and undertaken with malice and reckless indifference to Plaintiff's rights under the Whistleblower Act, and Plaintiff therefore seeks awards of punitive damages against these Defendants in order to deter them and others similarly situated from such wrongful conduct in the future.

**WHEREFORE,** Plaintiff demands a trial by jury of 12 persons and judgment in his favor on all his claims and relief as follows:

A.  Permanent injunctive relief including but not limited to an order that Plaintiff be reinstated, that all negative material related to the events at issue in this case be expunged from all NIU records, and that a written, public apology be issued acknowledging Defendants' wrongful conduct;

B.  Back wage and benefit loss;

C.  Front pay and benefit loss;

D.  Loss of earning capacity;

E.  Compensatory damages in an amount to be determined;

F.  Punitive damages in an amount to be determined;

G.  Plaintiff's reasonable attorney's fees and costs incurred in bringing this action; and

H.  Such other relief as the Court may deem just and proper.

Dated this 17th day of April, 2014.

Respectfully submitted

FOX & FOX, S.C.
s/Randall B. Gold
Michael R. Fox
221 N. LaSalle, Suite 2900
Chicago, IL 60601
Telephone: 847-796-5198
rgoldlaw@aol.com
mfox@foxquick.com