IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

DONALD GRADY II,

                Plaintiff,

      v.

BOARD OF TRUSTEES OF NORTHERN
ILLINOIS UNIVERSITY, *et al.*,

           Defendants.

Case No.  14 C 1245

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

For several years, Plaintiff Donald Grady ("Grady") served as Chief of Police and Public Safety at Northern Illinois University (hereinafter, "NIU" or the "University").  In 2013, Grady was fired in the wake of a scandal arising out of the NIU Police Department's alleged mishandling of a criminal sexual assault case involving an NIU police officer named Andrew Rifkin ("Rifkin") and an undergraduate student named K.K. (the Court will refer to the victim by her initials to protect her identity).  Grady, who is African American, sued NIU's Board of Trustees (the "Board") and a number of other individuals, alleging that he was discriminated against on the basis of race, retaliated against for complaining about racial discrimination and for investigating corruption within the NIU administration,

and denied substantive and procedural due process rights in connection with his termination. Grady also asserts claims for violations of the Illinois State Officials and Employees Ethics Act and the Illinois Whistleblower Act. In two separate Motions, the Defendants now seek to dismiss the claims against them.

## I. BACKGROUND

In November 2011, K.K. filed a complaint with the NIU Police Department alleging that Rifkin had raped her at his off-campus apartment. When confronted with the complaint, Rifkin admitted to having sexual relations with K.K., but insisted that the encounter had been consensual. The NIU Police Department referred the matter to the DeKalb County State's Attorney's Office for investigation and Rifkin thereafter was indicted on criminal sexual assault charges.

In the subsequent weeks, two female NIU undergraduates came to Grady's office to voice support for Rifkin. Although both students had not been present when the incident with K.K. occurred, they nonetheless informed Grady that they believed the encounter had been consensual. At Grady's urging, the students agreed to submit formal written statements to NIU Police Department Lieutenant Kartik Ramakrishnan ("Ramakrishnan"). After meeting with both students, Ramakrishnan placed their written statements in Rifkin's personnel file, but did not

complete a police report or add the statements to the Department's criminal investigation file because he believed that the students' accounts did not refute K.K.'s allegations.

Almost a year later, Rifkin's attorneys filed a motion in his criminal case seeking to dismiss the charges against him on the basis that the NIU Police Department had withheld the two students' statements in violation of *Brady v. Maryland,* 373 U.S. 83 (1963), which requires that certain exculpatory evidence "material either to guilt or to punishment" and known to the prosecution be tendered to a criminal defendant prior to trial. Upon learning of Rifkin's motion, Grady questioned Ramakrishnan about what had happened to the students' statements. Ramakrishnan admitted to Grady that he had misfiled the statements and neglected to provide them to the State's Attorney's Office for possible disclosure.

On November 2, 2012, Judge Robbin Stuckert, before whom Rifkin's criminal case was pending, held a hearing on the *Brady* motion. At the conclusion of the hearing, Judge Stuckert ruled that Ramakrishnan had withheld the statements intentionally. Judge Stuckert ultimately denied Rifkin's *Brady* motion, however, and he made no finding as to whether Grady had any role in the Police Department's failure to disclose.

Three days later, on November 5, 2012, the State's Attorney's Office issued a press release calling for an

investigation into what had occurred and asserting that the NIU Police Department's actions had "jeopardized Rifkin's defense and the police department's credibility." At the same time, an NIU representative stated publicly that the Illinois State Police would be asked to assist in the review and completion of that investigation.

On November 9, 2012, Grady's immediate supervisor, Eddie Williams ("Williams"), NIU's Executive Vice President and Chief of Operations, was relieved of his authority over the NIU Police Department, and F. William Nicklas ("Nicklas") was appointed in his place. At 7:30 p.m. that evening, Nicklas telephoned Grady to arrange a meeting the following morning. However, he did not disclose to Grady the purpose of that meeting.

At the scheduled meeting, Nicklas informed Grady that he was being placed on paid administrative leave effective immediately. Thereafter, Nicklas issued a news release announcing that Grady had been suspended "pending finalization of charges and disciplinary actions" against him. Grady also received a letter confirming his suspension, in which Nicklas stated that NIU intended to initiate proceedings to terminate him for "just cause" based upon the Police Department's failure to make mandatory *Brady* disclosures in connection with the Rifkin prosecution.

On November 17, 2012, the *Chicago Tribune* reported on an interview with NIU's President, Defendant John Peters ("Peters"), about Grady's suspension. Peters stated that Grady had been banned from campus because the University could not "under any circumstances tolerate such clear breaches of contracts, authority, and responsibility." The *Tribune* story added that the NIU Office of Public Relations had told the paper that Grady was "not expected to return to the job."

On November 28, 2012, Grady received a written statement listing the charges that NIU was "considering" bringing against him. These charges consisted of general assertions about Grady's misconduct in relation to his supervision of others regarding the handling of the two students' statements and his deletion of various files from his work computer prior to being placed on leave. The letter, however, cited no evidence in support of the University's position that Grady knew of or condoned Ramakrishnan's failure to disclose the students' statements.

On January 9, 2013, Nicklas sent Grady a further letter stating that NIU intended to initiate action to terminate his employment based upon the November 28, 2012 statement of charges. The letter informed Grady that he could request an "informal pre-termination meeting" with Nicklas and that he

would be permitted to present any information he believed would be relevant to the decision-making process.

After requesting a pre-termination meeting, Grady sent a letter to Nicklas objecting to the lack of specificity in NIU's charges and the University's failure to respond to his previous requests for clarification. In his letter, Grady further stated that he believed that NIU's actions were "not related to some fault or impropriety on [his] part, but rather [were] based on unjust, illicit, discriminatory, and/or retaliatory considerations."

Grady's pre-termination meeting was held on February 1, 2013. At that meeting, Nicklas told Grady that NIU had "substantially completed its review" and was considering disciplinary actions based upon its preliminary findings. Nicklas assured Grady that he would be given an opportunity to respond to NIU's charges before any disciplinary action would be taken. However, when Grady asked Nicklas to describe the specific evidence upon which the charges against him were based, Nicklas refused to do so.

Three weeks later, on February 19, 2013, Nicklas sent Grady a letter stating that his employment at NIU had been terminated. The stated bases for Grady's termination were his failure to "appropriately supervise" the NIU Police Department and the Department's mishandling of *Brady* material in connection with

Rifkin's criminal prosecution. In Grady's termination letter, Nicklas stated:

> I do not believe there was merely a mistaken withholding of evidence on the part of the Department in the *Rifkin* case. Moreover, I do not find credible your claim that you were not involved in the purposeful withholding of exculpatory evidence. . . . I find that you knew, or should have known, about all or most of this conduct. I further find that it is more probable than not that you either ordered, encouraged, and/or condoned much or all of it, or that you were indifferent to upholding the regular procedures of the Department in this case, or that you were negligent in your supervisory duties.

After engaging unsuccessfully in NIU's formal grievance process, Grady filed this lawsuit seeking, among other things, an order of reinstatement, back and front wages, damages based upon an alleged loss of earning capacity, and punitive damages. Grady contends that there was no evidence that he had anything to do with Ramakrishnan's mishandling of the students' statements and that his termination instead was the product of a "discriminatory and retaliatory agenda" on the part of Nicklas and other NIU officials. Grady further asserts that he was retaliated against for complaining about NIU's unlawful racial discrimination towards him in connection with the University's termination proceedings and for pursuing certain unrelated internal corruption allegations that implicated several NIU senior administrators. To that end, Grady argues that NIU's

stated reason for firing him was "nothing more than a convenient pretext for a draconian and preordained termination process" infected by unlawful discriminatory animus. (Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss ("Pl.'s Opp. Mem.") at 2, ECF No. 21).

## II.  LEGAL STANDARD

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of a complaint. *Hallinan v. Fraternal Order of Chi. Lodge No. 7,* 570 F.3d 811, 820 (7th Cir. 2009).  A complaint must provide a short and plain statement of the claim showing that the plaintiff is entitled to relief.  FED. R. CIV. P. 8(a)(2).  Essentially, the complaint must provide the defendant with "fair notice" of the claim and its basis.  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  Thus, to survive a motion to dismiss, a complaint must contain sufficient factual allegations that, if accepted as true, state a claim that is plausible on its face.  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

## III.  ANALYSIS

The Defendants in this case have divided themselves into two groups, each of which now separately seeks dismissal of various claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The first group is comprised of the Board and Defendants Nicklas, Peters, Steven Cunningham ("Cunningham"),

and Jerry D. Blakemore ("Blakemore"), all senior administrators at NIU (hereinafter, collectively, the "Administration Defendants"). The second group of Defendants is comprised of several NIU employees who served as members of the committee that denied Grady's request for a grievance hearing (hereinafter, collectively, the "Grievance Committee Defendants").

## A. The Administration Defendants

### 1. *Cunningham and Blakemore*

As an initial matter, Cunningham and Blakemore separately seek dismissal of the Complaint as it relates to them on the basis that Grady's allegations fail to disclose facts sufficient to demonstrate that they had any part in the decision to suspend or terminate his employment at NIU.

At the time of the events alleged in the Complaint, Cunningham occupied the Office of Vice President for Administration and Human Resources; Blakemore served as Vice President and General Counsel. Although the Complaint asserts that Cunningham and Blakemore "participated" in NIU's termination decision, it provides no detail as to how either was involved. Grady appears to be of the view that no elaboration is necessary, contending instead that Cunningham and Blakemore's participation simply can be assumed based upon their job titles and the fact that both Defendants had a motive to fire him

because he recently had named them as the targets of an internal corruption investigation. Any inference that might be drawn in that regard, however, would be wholly speculative. While one could surmise from the Complaint that Cunningham and Blakemore *possibly* were involved in the decision to fire Grady because both had the ability and motive to direct his termination, allegations that are "merely consistent" with the potential for liability cannot alone form the basis of a plausible claim to relief. *Iqbal,* 556 U.S. at 678 (quotation marks and citation omitted).

Because the Complaint fails to reveal anything about Cunningham and Blakemore's actual conduct beyond the unsupported conclusion that they "participated" in Grady's termination, the claims asserted against both Defendants must be dismissed.

### 2. The Board, Nicklas, & Peters

The remaining Administration Defendants challenge several aspects of the Complaint. They first contend that they cannot be held liable for any of the wrongdoing alleged in the Complaint because they are protected from civil liability under the doctrine of qualified immunity. Qualified immunity insulates state actors from civil lawsuits "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sullivan v. Ramierez,* 360 F.3d 692, 697 (7th Cir.

2004).  Because that inquiry ordinarily requires analysis of the evidence specific to the case at hand, issues of qualified immunity generally are addressed at the summary judgment rather than the pleading stage.  *Alvarado v. Litscher,* 267 F.3d 648, 651 (7th Cir. 2001).  Moreover, a discrimination plaintiff "is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity." *Tamayo v. Blagojevich,* 526 F.3d 1074, 1090 (7th Cir. 2008). Although dismissal based upon qualified immunity may be appropriate in limited circumstances where it is obvious that the plaintiff seeks relief based upon the violation of "a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred," *Jacobs v. City of Chicago,* 215 F.3d 758, 765 n.3 (7th Cir. 2000), the allegations in this case concern racial discrimination and retaliation, the applicable constitutional standards for which were well-established at the time of the events alleged in the Complaint. *See, e.g., Auriemma v. Rice,* 910 F.2d 1449, 1457 (7th Cir. 1990); *Jacobeit v. Rich Twp. High Sch. Dist. 227,* 673 F.Supp.2d 653, 661 (N.D. Ill. 2009).  Because the Administration Defendants have not demonstrated how "their actions could reasonably have been thought consistent with the rights they are alleged to have violated," *Anderson v. Creighton,* 483 U.S. 635,

638 (1987), the claims against them may not be dispensed with on immunity grounds at this stage.

The Administration Defendants' next quibble is with Grady's 42 U.S.C. § 1981 ("Section 1981") equal protection/race discrimination and retaliation claims, which are set forth in Counts III and IV, respectively. The Administration Defendants contend that those counts should be dismissed because Grady failed to invoke 42 U.S.C. § 1983 ("Section 1983"), which is the exclusive remedy for Section 1981 violations committed by state actors. *See, Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701 (1989). Although the Administration Defendants are correct that recovery under Section 1981 is available only pursuant to the general procedural mechanism created by Section 1983, the Complaint states explicitly that Counts III and IV are "brought through 42 U.S.C. § 1983." (Am. Compl. at 31-32, ECF No. 6). That is sufficient under federal pleading standards to survive a motion to dismiss. Indeed, it is more than is required. As the Supreme Court emphasized quite recently, the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.,* 574 U.S. ---, 135 S.Ct. 346, 346 (2014)*(per curiam).* In *Johnson,* the Court summarily reversed a decision of the Court of Appeals for the Fifth Circuit, which had held inadequate a civil rights

complaint against state actors that failed to mention Section 1983 specifically. The Court stressed that a complaint need not contain a "punctiliously stated 'theory of the pleadings'" and that "no heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim." *Id.* at 347.

The Administration Defendants further contend that Count III is inadequate because Grady failed to allege facts suggesting that he was treated less favorably than other similarly situated non-African American individuals. While it is true that a plaintiff who lacks direct or circumstantial evidence of discrimination may seek to establish his case "indirectly" through the evidentiary framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801-03 (1973) – one aspect of which requires proof that similarly situated employees received more favorable treatment, *see, Naficy v. Ill. Dep't of Human Servs.,* 697 F.3d 504, 511 (7th Cir. 2012) – the *McDonnell Douglas* standard has no application at the pleading stage. *Carlson v. CSX Transp., Inc.,* 758 F.3d 819, 827 (7th Cir. 2014). Thus, a plaintiff "is not required to include allegations [in his complaint] – such as the existence of a similarly situated comparator – that would establish a prima facie case of discrimination under the

'indirect' method of proof." *Id.* Rather, the "argument that [Grady] has not identified any similarly situated, non-African American, light-skinned employees who were treated more favorably is an issue more appropriately addressed in a summary judgment motion than a motion to dismiss." *Howell v. Rush Copley Med. Grp. NFP,* No. 11 C 2689, 2012 WL 832830, at *5 (N.D. Ill. Mar. 12, 2012).

The Seventh Circuit repeatedly has held that the requirements for pleading a case of race discrimination are "minimal." *See, e.g., Tamayo,* 526 F.3d at 1084. To survive a motion to dismiss, the complaint "need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of his race." *Lavalais v. Vill. of Melrose Park,* 734 F.3d 629, 633 (7th Cir. 2013) (parenthetical in original, brackets omitted). The allegations in this case plainly meet that standard. The Complaint asserts that Grady was fired because he is African American, that his alleged role in the mishandling of the Rifkin witness statements was a pretext for the true racial motivations underlying his termination, and that, even if he somehow was responsible for the NIU Police Department's failure to disclose *Brady* material, he was treated worse than other Caucasian employees who were involved in more serious misconduct. While the Administration Defendants remain adamant that Grady's termination was

"completely unrelated to race or any other protected factor,"
(Admin. Def.'s' Reply in Supp. of Mot. to Dismiss at 6, ECF
No. 23), Grady's allegations are plausible enough to state a
claim.

The Administration Defendants next argue that Count V,
which asserts a claim for denial of due process under the
Fourteenth Amendment of the United States Constitution, should
be dismissed because (1) Grady was not entitled to any
procedural protections in connection with his paid pre-
termination suspension, and (2) Grady was afforded adequate
process prior to his termination. With regard to the first
point, although being placed on paid administrative leave
ordinarily "does not trigger due-process protections unless the
suspension imposes a substantial indirect economic effect on the
plaintiff," *Palka v. Shelton,* 623 F.3d 447, 452 (7th Cir. 2010),
Grady's Complaint makes the case that he indeed suffered from
various indirect effects. To wit, Grady alleges that his
suspension "had a devastating impact on [his] reputation and
career and rendered him unemployable as a sworn law enforcement
officer at any level." (Am. Compl. ¶ 102). The Complaint goes
on to assert that the Defendants' "unlawful conduct," which
includes his suspension, caused "loss of employment, loss of
past and future income and benefits, loss of earning capacity,
emotional distress, loss of reputation, and humiliation and

embarrassment." (*See, id.* ¶¶ 29, 30, 31, 32, 35, 38, 40, & 41).
As the Seventh Circuit has recognized, an employment action that
"impedes future job opportunities or has other indirect effects
on future income can inflict an actionable deprivation of
property." *Head v. Chicago Sch. Reform Bd. of Trs.,* 225 F.3d
794, 803 (7th Cir. 2000). While the Administration Defendants
argue that Grady's claimed damages in that regard arose from his
termination rather than his suspension, proof of any precise
causal link is not required at this early juncture. *See, Keel
v. Vill. of Harvey,* No. 10 C 6467, 2010 WL 310768, at *2 (N.D.
Ill. Jan. 21, 2010). It is enough for now that Grady has
alleged that his suspension caused him to suffer significant
indirect economic effects.

   As for the Administration Defendants' contention that NIU's
pre-termination procedural protections were sufficient, Grady's
Complaint makes clear that the limited process he did receive
fell far below the standards required by law. Public employees
who are, by virtue of contract or other legal authority, subject
to discharge only for "just cause," must be afforded certain
minimum pre-termination safeguards, even when there is an
opportunity for a more comprehensive post-termination hearing.
*Baird v. Bd. of Ed. for Warren Cmty. Unit Sch. Dist. No. 205,*
389 F.3d 685, 690-91 (7th Cir. 2004). These pre-termination
safeguards include "(1) oral or written notice of the charges;

(2) an explanation of the employer's evidence; and (3) an opportunity for the employee to tell his or her side of the story." *Head,* 225 F.3d at 804.

While NIU did send Grady a letter purporting to set forth a statement of the charges against him, that communication consisted only of "general assertions" and did not describe any of the University's supporting evidence. (Am. Compl. ¶¶ 78-80). Subsequent communications similarly revealed little about the evidence upon which the charges against Grady were based. (*Id.* ¶ 81). Although Nicklas agreed to hold a pre-termination "hearing" at Grady's request, he did nothing at that conference other than "recite[] the charges against [Grady] and list[] a series of documents that would be made available . . . after the meeting." (*Id.* ¶ 89). The contents of those documents were not discussed; nor, despite his repeated requests for further information, was Grady told how they or any other evidence related to the charges against him.

At some point prior to his termination, Grady was entitled to an explanation of the University's evidence. Merely alluding without specifics to the various "types" of adverse evidence upon which NIU intended to rely was not sufficient. In the end, NIU never laid out its full case against Grady until after it already had rendered a final decision. (Am. Compl. ¶ 94).

Compounding that problem is the fact that Grady did not receive a post-termination hearing, which NIU was required to provide under law. *Gilbert v. Homar,* 520 U.S. 924, 929 (1997); *Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 545-46 (1985); *Swank v. Smart,* 898 F.2d 1247, 1256 (7th Cir. 1990). Upon filing a grievance in accordance with NIU's internal policies, Grady's request for a hearing was denied without explanation despite his renewed complaints of unlawful discrimination and retaliation. (Am. Compl. ¶ 113). That denial ended the grievance process and left Grady without a meaningful opportunity to address the University's evidence or respond to the charges against him. In view of these allegations, Grady has stated a claim for a violation of his due process rights.

The Administration Defendants next take issue with the separate aspect of Grady's due process claim that seeks damages based upon his alleged loss of a liberty interest in future employment in the law enforcement field. Where, as here, "an employee claims that a government employer has infringed his liberty to pursue the occupation of his choice, the employee must show that (1) he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed and (3) he suffered a tangible loss of other employment opportunities as a result of public disclosure." *Townsend v. Vallas,* 256 F.3d 661, 669-70 (7th Cir. 2001). Grady's

allegations satisfy all three of these elements. According to the Complaint, the Administration Defendants pursued a highly public termination process, in which Grady was accused of serious personal and supervisory misconduct. Upon Grady's suspension, Nicklas issued a press release that blamed Grady for his direct involvement in the withholding of evidence in the Rifkin case. That release, as well as a letter on the same topic that was sent to Grady directly, received "wide publicity and adverse editorial comment" in the media. (Am. Compl. ¶ 68). NIU's final termination letter, in which Nicklas stated his finding that Grady had "ordered, encouraged, and/or condoned much or all of" the misconduct in the Rifkin case and that he was "indifferent to upholding the regular procedures of the Department . . . or that [he was] negligent in [his] supervisory duties," also received broad press coverage. (*Id.* ¶ 100). Grady asserts that NIU's actions thus had the effect of ruining his reputation to the extent that he no longer is capable of finding work as a law enforcement officer "at any level." (*Id.* ¶ 102).

The Administration Defendants insist that they cannot be held responsible for Grady's diminished employment prospects because the circumstances surrounding his termination already had been made public by virtue of a press release issued previously by the DeKalb County State's Attorney's Office and

Judge Stuckert's findings on the record in Rifkin's criminal case. However, it was Ramakrishnan and the NIU Police Department in general – not Grady – that were blamed by Judge Stuckert and the State's Attorney's Office for the alleged *Brady* violations in the Rifkin case. NIU alone took the further step of naming Grady specifically, and it was the University's decision to publicize his termination that likely inflicted the most damage on his ability to find future employment. *See, Townsend,* 256 F.3d at 670 ("[A]t the heart of every claim that an employer has infringed an employee's liberty of occupation, is a charge that the 'circumstances of the discharge, at least if they were publically stated, had the effect of blacklisting the employee from employment in comparable jobs.'")(quoting *Colaizzi v. Walker,* 812 F.2d 304, 307 (7th Cir. 1987)). To that end, Grady has stated a claim based upon the deprivation of a liberty interest in future employment in law enforcement.

Finally, the Administration Defendants argue that Count VIII, which asserts retaliation claims under the Illinois Whistleblower Act, should be dismissed because individual defendants cannot be held liable under the Act unless they also are the plaintiff's "employer," which the Administration Defendants contend they were not. Grady has agreed to withdraw Count VIII voluntarily, (*see,* Pl.'s Opp. Mem. at 3 n.1), so

there is no need to address the merits of this argument. Accordingly, Count VIII is dismissed as to all Defendants.

## B. The Grievance Committee Defendants

The Grievance Committee Defendants have moved to dismiss Grady's procedural due process claim (Count V) – the only claim asserted against them – on grounds that they are protected by absolute judicial immunity with respect to their decisions relating to Grady's termination. As its name implies, absolute judicial immunity is a form of protection ordinarily available only to judges. Nonetheless, absolute "quasi-judicial" immunity has been extended to non-judges in two limited circumstances: first, where a non-judicial officer acts in a judicial capacity or engages in quasi-judicial conduct, and second, where a subordinate undertakes certain administrative functions at the express direction of a judicial officer. *Snyder v. Nolen,* 380 F.3d 279, 286-87 (7th Cir. 2004). The Grievance Committee Defendants do not contend that they acted pursuant to the authority of any judicial officer. Rather, they argue that the resolution of Grady's grievance was a quasi-judicial function and that their role in the process was equivalent to that of a judicial decisionmaker.

In assessing whether conduct is quasi-judicial, courts apply a "functional approach," which "look[s] to the nature of the function performed, not the identity of the actor who

performed it." *Heyde v. Pittenger,* 633 F.3d 512, 517 (7th Cir. 2011)(quotation marks and citations omitted). Six factors, initially set forth by the Supreme Court in *Butz v. Economou,* 438 U.S. 478 (1978), are central to that determination:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger v. Saxner,* 474 U.S. 193, 202 (1985)(citing *Butz*, 438 U.S. at 512).

Before turning to these factors and the particulars of this case, it should be noted that the Seventh Circuit has concluded that it is "most unlikely" that an NIU hearing official would be entitled to absolute immunity. *Osteen v. Henley,* 13 F.3d 221, 224 (7th Cir. 1993). Although the court did not rule either way on the issue, a review of related precedent is instructive.

In *Wood v. Strickland,* 420 U.S. 308 (1975), the Supreme Court considered whether school board members who voted to expel a student were entitled to absolute judicial immunity. The Court reasoned that, even though the board members were "adjudicators" and "judge[d] whether there [were] violations of school regulations," affording them absolute immunity was not

appropriate because doing so "would not sufficiently increase the ability of school officials to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations." *Wood,* 420 U.S. at 319-20.

Applying this reasoning, the Fifth Circuit, in *Harris v. Victoria Independent School District,* declined to extend absolute immunity to school board members who claimed that their review of a teacher's grievance was quasi-judicial in nature. *Harris v. Victoria Independent School District,* 168 F.3d 216, 224-25 (5th Cir. 1999). Although the court noted that it was important for school board members to be able to render decisions free from the threat of incurring personal liability, it found that qualified immunity afforded sufficient protections in that regard. *Id.* at 225. The Third, Sixth, and Eleventh Circuits have arrived at similar conclusions in comparable cases. *See, Skehan v. Bd. of Trs. of Bloomsburg State Coll.,* 538 F.2d 53, 60 (3d Cir. 1976)(*en banc*)(finding no appreciable difference between the school board members in *Wood* who adjudicated a student discharge and state college officials who were tasked with adjudicating a faculty termination); *Purisch v. Tenn. Technological Univ.,* 76 F.3d 1414, 1422 (6th Cir. 1996) (denying absolute immunity to a university grievance committee); *Stewart v. Baldwin Cnty. Bd. of Educ.,* 908 F.2d 1499, 1508 (11th

Cir. 1990)(denying absolute immunity to school board officials who made the final decision to discharge a school maintenance department employee).

Application of the six *Butz* factors to the facts as alleged in this case yields no different result. First, there is nothing to suggest that the Grievance Committee Defendants are in need of any protection beyond qualified immunity to insulate them from harassment or intimidation. Second, there do not appear to have been adequate safeguards in place that would have assured the Grievance Committee's compliance with constitutional requirements. Indeed, there were "no standards" for ruling on grievances or determining whether or not to grant a request for a hearing. (Am. Compl. ¶ 111). Third, because the Grievance Committee Defendants also were University employees, they did not have the type of independence typically associated with judicial decisionmakers. *See, e.g., Cleavinger,* 474 U.S. at 203-04 (finding that prison disciplinary board members who also served as prison employees and were subordinate to the warden were "under obvious pressure to resolve . . . disciplinary dispute[s] in favor of the institution and their fellow employee[s]"). Fourth, there is no indication that the Grievance Committee placed any weight on precedent or applied any legal framework at all when evaluating the evidence. Fifth, the grievance procedure, as far as Grady was concerned, was not

adversarial.  According to the Complaint, Grady was not allowed "any input" into the decision regarding his request for a hearing.  (Am. Compl. ¶ 111).  Although he was permitted to communicate with the Grievance Committee in writing, he never received a meaningful opportunity to present his case or respond to the University's evidence.  Rather, his grievance was denied summarily and the Committee offered "no explanation" of its decision.  (*Id.* ¶ 113).  Sixth, and finally, there was no internal appellate process available by which Grady could have sought review of the Grievance Committee's ruling.  Although the Grievance Committee Defendants point out that Grady could have challenged their decision by filing a common law *writ of certiorari* with an Illinois circuit court, that recourse is available in most state administrative actions where the Illinois Administrative Review Law does not provide other alternatives.  *See, Arroyo v. Chi. Transit Auth.,* 916 N.E.2d 34, 40 (Ill. App. Ct. 2009).  Thus, the opportunity to file such a writ does not set the grievance process in this case apart from any other non-judicial administrative determinations in Illinois.

On balance, the grievance process in this case cannot be characterized as quasi-judicial in nature.  The Grievance Committee Defendants were not akin to neutral judges and the proceedings here bore little resemblance to those of a court of

law.  For these reasons, it would be inappropriate to extend the protections of absolute judicial immunity to the Defendants in this case.

<h3 align="center">IV.  CONCLUSION</h3>

For the reasons stated herein, the Defendants' Motions to Dismiss [ECF Nos. 15, 17] are granted in part and denied in part.

**IT IS SO ORDERED.**

_____
                    Harry D. Leinenweber, Judge
                    United States District Court

Dated:1/16/2015