UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

DONALD GRADY II,

       Plaintiff,

-vs-                                     Case No: 14-cv-01245

BOARD OF TRUSTEES OF NORTHERN        Honorable Harry D. Leinenweber
ILLINOIS UNIVERSITY, F. WILLIAM
NICKLAS, JOHN G. PETERS, STEVEN
CUNNINGHAM, JERRY D. BLAKEMORE,
DEBRA BOUGHTON, KATHERINE LITTLE,
RANDI NAPIENTEK, JONATHON
OSTENBURG and MICHAEL STANG,

       Defendants.

---

**PLAINTIFF'S MEMORANDUM IN RESPONSE
TO DEFENDANT'S MOTION TO QUASH SUBPOENAS
AND FOR PROTECTIVE RELIEF**

---

Defendant Board of Trustee's motion to bar the depositions of NIU President Douglas Baker and former Student Trustee Elliott Echols or to force plaintiff to use more cumbersome and time-consuming discovery methods must be denied. There is ample evidence that both Echols and Baker were percipient witnesses to critical aspects of the unlawful conduct plaintiff alleges in this case, and the Board has not and cannot prove otherwise. The Board's procedural objections are also either now moot or easily dealt with by an order that the parties work out mutually acceptable deposition dates and forms of notice.

    **A.**   **The Board has failed to establish any basis for exempting Baker or Echols from their well-established duty to provide relevant evidence based on their personal involvement in and knowledge of this case**

The Board's motion substantially overstates both the proper scope and content of the

circumstances in which "high-ranking public officials" are sometimes wholly or partially excused from giving evidence in legal proceedings. First, while NIU President Douglas Baker might arguably qualify as the kind of "apex" executive official to which this limited exception could apply, former Student Trustee Elliott Echols very clearly does not. To be sure, as an *entity* the entire NIU Board of Trustees is the ultimate controlling authority for the University, but any single member of that Board—particularly a former student member—simply does not fit the profile of the lone, highest-level full-time operating executive of an entire government or government entity—e.g., a governor, federal agency director, attorney general, etc.—whom the courts have sometimes excused from testimony in matters that have occurred on their watch but for which they clearly had no personal involvement or knowledge.

Second, defendant Board is asking this Court to apply a legal standard that is far more stringent and impractical than the simple, straightforward approach that has actually been followed by the Seventh Circuit itself and, pursuant to that authority, by district courts in this circuit—particularly in the Northern District of Illinois. In *Olivieri v. Rodriguez*, 122 F.3d 406 (7th Cir. 1997), the Seventh Circuit stated that a public official's deposition could be taken if "**there is some reason to believe that the deposition will produce or lead to admissible evidence**" in the case. *Id*. at 409-410 (emphasis added). *See also Stagman v. Ryan*, 176 F.3d 986, 994-95 (7th Cir. 1999), quoting *Olivieri*.

This Seventh Circuit standard has been followed in turn by the district courts. In *Hobley v. Burge*, 2007 WL 551569 (N.D. Ill.), the court restated the bedrock principles that "[t]he scope of discovery includes 'any matter, not privileged, that is relevant to the claim or defense of any party,' and that '[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.'" *Id*. at *2, quoting Fed.R.Civ.P. 26(b)(1). The court then acknowledged the equally fundamental rule that, if a high-

ranking public official "has discoverable information" of this kind, "**the parties may not be deprived of that information simply because of the official's status.**" *Id.* at \*2 (emphasis added), citing *Clinton v. Jones*, 520 U.S. 681, 703-705(1997) (citing cases in which the President of the United States was required to provide testimony). Citing *Olivieri*, the court in *Hobley* held, again, that a high-ranking public official can be required to honor this universal obligation to give evidence if the party seeking his testimony can demonstrate that "there is some reason to believe that the deposition will produce or lead to admissible evidence." *Id.* at \*2.

*Hobley's* analysis has been endorsed and followed by other Illinois district courts. In *Bagley v. Blagojevich*, 486 F.Supp.2d 786 (C.D. Ill. 2007) the court explicitly rejected the far more stringent "standard" that defendant Board attempts to impose here—that the party seeking to depose a high-ranking public official (there, the Governor of Illinois) was required to "identify a particularized need for the deposition and show that such need has not and cannot be satisfied in a less burdensome manner"—for which the defendants could "cite no controlling authority." *Id*. at 789. Instead, the court in *Bagley* found, *Hobley*'s interpretation of *Olvieri* is "an accurate assessment of the relevant law in the Seventh Circuit," and the court again reiterated the Seventh Circuit standard that high-ranking public officials are not exempt from being deposed where "'there is some reason to believe that the deposition will produce or lead to admissible evidence.'" *Id.* at 789, quoting *Olivieri. See also Cannon v. Burge*, 2007 WL 2410392, \*2 (N.D. Ill.) (following *Bagley* and *Hobley*).

That standard is amply met here. Tellingly, the Board's Motion to Quash simply "states"—without support of any kind—that plaintiff "cannot establish" the requisite basis for the depositions he seeks (Motion, p. 4, § 9), and the Board has failed entirely to take the simple, obvious—and, in cases of this kind, altogether common—step of having President Baker or former Trustee Echols supply declarations actually confirming the Board's bare, unsupported

assertion that both of these witnesses "were not personally involved in the discipline, grievance procedure or separation from employment of Plaintiff—the very subjects of this litigation" (Motion, p. 3, § 7.) And there is, in fact, far more than merely "some reason to believe" that both Echols and Baker *were* involved in and have substantial personal knowledge of critical aspects of plaintiff's abrupt placement on administrative leave on November 11, 2012, of the "disciplinary" proceedings that culminated in his termination on February 19, 2013, and of the post-termination grievance procedure that continued into July 2013 and ultimately denied him any hearing and left his termination in effect.

### 1. Elliott Echols

By virtue of his position as a serving member of the NIU Board of Trustees throughout that period from late 2012 through 2013, Elliott Echols was necessarily involved in the highly public and contentious process by which the University's Chief of Police—a high-ranking NIU official in his own right—was being permanently removed from his position. As plaintiff's counsel attests in the attached declaration,

> On information and good faith belief, in late 2012 and in 2013 Elliott Echols, then a Student Member of the Board of Trustees of Northern Illinois University, had non-privileged conversations with potential witnesses in this case who have previously been identified by plaintiff in discovery, in which Echols, based on his personal knowledge and involvement, made statements concerning plaintiff's termination and the defendants' reasons therefor.

(Declaration of Michael R. Fox ("Fox Decl.") ¶ 2.) The existence of these conversations and the clear proof they provide that Echols, through his Board membership, was indeed involved in and had direct knowledge of plaintiff's termination process is in turn confirmed by NIUPD Deputy Chief Darren Mitchell, who has testified that, while serving as Acting Chief in plaintiff's place from the time plaintiff was first placed on leave through his termination and grievance proceedings, Mitchell talked with Echols "about the board's discussions concerning Chief Grady

4

and getting rid of Chief Grady." (Fox Decl., Exh. C, p. 128.)

Defendants' own newly-produced Privilege Log of Documents—first given to plaintiff's counsel on July 14, 2016, two days after the Board's Motion to Quash was filed (Fox Decl. ¶ 4)—also shows that:

- On the day of plaintiff's termination, February 19, 2013, Echols and other Board members, along with defendants Peters and Nicklas and other NIU officials centrally involved in this case, received email correspondence and an attachment about a "Personnel Matter/Action . . . reflecting legal advice on the subject matter of this litigation." (Fox Decl., Exh. B, p. 11, no. 141.)

- On June 13, 2013—one month before the Grievance Committee's July 11, 2013 vote to deny plaintiff any hearing and thereby confirm his termination—Echols and other Board members received correspondence and an attached memo, "For Internal Discussion and Information . . . RE: Status of Dr. Donald Grady Grievance & Related Recommendations of Counsel." (Fox Decl., Exh. B, p. 2, no. 32.)

Regardless of whether the specific content of these documents is or is not genuinely privileged, the simple fact that Echols received these highly substantive discussions and recommendations regarding plaintiff at these critical junctures in the termination and grievance process leaves no possible doubt that Echols was, in fact, centrally involved in and personally knowledgeable about that process and that there is thus more than sufficient "reason to believe that [his] deposition will produce or lead to admissible evidence" in this case.

### 2. Douglas Baker

The same is true of President Baker. Defendant Peters' testimony indicates that he ceased being NIU's President and became President Emeritus as of "June 2013" and that the effective date of this cessation of his responsibilities as President occurred no later than June 24, 2013. (Fox Decl., Exh. D and E.) Defendants' Privilege Log clearly demonstrates that Baker, as the incoming President, was already being involved at a highly substantive level in plaintiff's post-termination grievance process both before and after defendant Peters relinquished his responsibilities as President:

5

- On May 1 and May 3, 2013—after plaintiff's informal Step I grievance had been denied and he had made clear that he would be seeking a formal Grievance Committee hearing under Step III—Baker, along with then-President Peters and his subordinate officials, received email correspondence and an attachment from defendant Nicklas reflecting legal advice regarding the "search process" to replace plaintiff as Chief of the NIUPD. (Fox Decl., Exh. B, p. 5, no. 80-81; pp. 8-9, no. 126-27.)

- On June 13, 2013, Baker received the same correspondence and memo as Echols (as set forth above), regarding "internal information and discussion" of the status of plaintiff's grievance and of "related recommendations of counsel." (Fox Decl., Exh. B, p. 2, no. 32.)

- On July 16, 2013—just five days after the Grievance Committee's July 11 vote to deny plaintiff any hearing on his grievance—Baker and defendant Peters received email correspondence, which was also copied to defendant Nicklas and the other NIU officials involved in plaintiff's termination, attaching a memo from NIU General Counsel Jerry Blakemore to the Board of Trustees "regarding the status of due process" in plaintiff's case. (Fox Decl., Exh. B, p. 9. No. 132.)

As with Echols, Baker's receipt of these vital executive communications at these times demonstrates clearly that he had been brought fully into the loop with regard to, at very least, the grievance phase of plaintiff's removal as Chief of the NIUPD, and that Baker therefore necessarily acquired personal, non-privileged knowledge regarding that process that is highly relevant to plaintiff's claims in this case.

That July 16, 2013 correspondence to Baker and Peters regarding the "status" of plaintiff's grievance also takes on added significance in light of the fact that the NIU Grievance Procedure explicitly gave the University's President the authority and responsibility to grant or deny final approval to the Grievance Committee's decision to deny any due process hearing to plaintiff :

**11.10 Administrative provisions relating to the grievance procedure**

(a) The Board of Trustees has delegated authority to the President of the University with respect to certain matters regarding University operations. Under this delegation of authority, specific University administrators and offices are assigned responsibilities with respect to the conduct of University operations and personnel procedures. Should a grievance proceed through the process and result in a recommendation by the Grievance Committee, this recommendation shall be

6

forwarded to the President, who will make the final determination with respect to implementing or amending the recommendation, or returning it to the Grievance Committee for additional consideration. *All final dispositions of formal grievances are subject to applicable laws; University rules, policies, and regulations; and approval of the President.*

(Fox Decl., Exh. F, § 11.10(a) (emphasis added).) While defendants now claim that the Grievance Committee's decision to "conclude the grievance process" (*id*. at § 11.5.3.2) by denying plaintiff a hearing was somehow not subject to this provision at all, that assertion was flatly contradicted at deposition by Prof. Alan Rosenbaum—who was responsible for administration of the Grievance Committee's role in plaintiff's grievance—and even, grudgingly, by Vice President-Administration and Human Resources Steven Cunningham. (Fox Decl., Exh. G and H.)

If defendant Peters relinquished his duties as President in early June 2013, therefore, this responsibility to either approve the Grievance Committee's final disposition or to disapprove it and order a constitutionally mandated hearing consistent with "applicable law" necessarily fell to Baker as the succeeding President, and the fact that Baker was sent a report "regarding the status of due process" in plaintiff's case only five days after the Committee's decision makes clear that he was, in fact—contrary to defendants' proffered stipulation (Exhibit 3 to Declaration of Christina M. Janice (ECF No. 70-3), p. 2)—made fully aware of that disposition. The evidence thus demonstrates that, by this stage, Baker had not just been kept in the loop regarding the processing of plaintiff's grievance but had in fact become a central participant in that process. Once again, therefore, it is beyond dispute that Baker has personal knowledge of this and other aspects of plaintiff's grievance process and that there is thus more than sufficient "reason to believe that [his] deposition will produce or lead to admissible evidence" in this case.

**B. None of the Board's procedural objections justifies an order quashing plaintiff's deposition subpoenas**

The Board's add-on complaints that the subpoenas' original two-day return time was "unreasonable" and that plaintiff failed to meet the technical requirements for notice to "every other party" (Motion, pp. 4-5, ¶¶ 10-11) do not remotely justify an order barring the depositions of Echols and Baker altogether or forcing plaintiff (and the Court) to waste months pursuing their evidence through interrogatories. The original deposition dates were obviously mooted by the Board's own Motion to Quash, and once that motion is denied by the Court, the parties can easily—with or without an order from the Court—work out mutually agreeable deposition dates and times, and all parties can be given whatever formal notice of the subpoenas they feel they have so far been denied.

The Board's assertion that plaintiff had advised the Court at the previous status conference that he was "done with discovery" (Motion, p. 5, ¶ 12) is also particularly disingenuous in light of defendants' own recent conduct. While plaintiff's counsel has so far been denied access to defendants' transcript of that conference, his best recollection is that his statement to the Court about further discovery was contingent on there arising no unforeseen, last-minute further need for additional discovery, or words to that effect. (Fox Decl. ¶ 3.) And on July 14, 2016, the final day of discovery, defendants transmitted to plaintiff, along with their new Privilege Log, a set of newly-disclosed documents that are highly relevant to and probative of central issues of liability in this case, for which defendants had previously claimed privilege but for which their transmittal letter now stated they "withdraw claims of privilege." (Fox Decl., ¶ 4 and Exh. A.) Had defendants not withheld this vital evidence until this very late date, those documents would have played a central part in plaintiff's depositions of defendant Peters and Vice President Cunningham, at very least, and plaintiff will now be forced to seek further

8

discovery on these matters as a result of defendants' tardy disclosure.

Once again, therefore, the Board has failed to state any legal, factual, or even equitable basis for barring the discovery plaintiff has sought by means of its timely deposition subpoenas for Echols and Baker, and plaintiff therefore respectfully urges the Court to deny the Board's motion and permit those depositions to proceed in an orderly fashion.

Dated:  July 21, 2016

Respectfully submitted,

Plaintiff Donald Grady II

By his attorneys,

/s/ Michael R. Fox
Michael R. Fox
Fox & Fox, S.C.
124 West Broadway
Monona, WI 53716
Tel: (606) 258-9588

Randall B. Gold
Fox & Fox, S.C.
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Tel: (954) 522-6601

9

## CERTIFICATE OF SERVICE

I, Michael R. Fox, an attorney, hereby certify that on July 21, 2016, I electronically filed the above PLAINTIFF'S MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION TO QUASH SUBPOENAS AND FOR PROTECTIVE RELIEF with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Michael R. Fox
Michael R. Fox
Fox & Fox, S.C.
124 West Broadway
Monona, WI 53716
Tel: (606) 258-9588