# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

DONALD GRADY, II,                          )

        Plaintiff,                     ) Case No.

    vs.                                    ) 14 CV 1245

BOARD OF TRUSTEES OF NORTHERN              )

ILLINOIS UNIVERSITY; F. WILLIAM            )

NICKLAS; JOHN G. PETERS; STEVEN            )

CUNNINGHAM; JERRY D. BLAKEMORE;            )

DEBRA BOUGHTON; KATHERINE LITTLE;          )

RANDI NAPIENTEK; JONATHON                  )

OSTENBURG; and MICHAEL STANG,              )

        Defendants.                    )

        The videotaped deposition of DONALD

GRADY, II, called for examination, taken pursuant

to the Federal Rules of Civil Procedure of the

United States District Courts pertaining to the

taking of depositions, taken before DINA G.

MANCILLAS, a Certified Shorthand Reporter within

and for the State of Illinois, CSR No. 84-3400 of

said state, at Suite 2400, 131 South Dearborn

Street, Chicago, Illinois, on January 11, 2016, at

9:30 a.m.

Donald Case: 1:14-cy-01245 Document #: 94-1 Filed: 10/28/16 Page 3 of 43 PageID #:881 2016

```
1    PRESENT:

2

3            FOX & FOX, SC,

4            (124 West Broadway,

5            Monona, Wisconsin  53716,

6            800-416-5368), by:

7            MR. MICHAEL R. FOX,

8            mfox@foxquick.com,

9            MR. RANDALL B. GOLD,

10           rgoldlaw@aol.com,

11               appeared on behalf of the Plaintiff;

12

13           SEYFARTH SHAW LLP,

14           (131 South Dearborn Street, Suite 2400,

15           Chicago, Illinois  60603-5577,

16           312-460-7000), by:

17           MR. GERALD L. MAATMAN, JR.,

18           gmaatman@seyfarth.com,

19           MS. MARY KAY KLIMESH,

20           mklimesh@seyfarth.com,

21               appeared on behalf of the Defendants.

22

23

24
```

Case: 1:14-cv-01245 Document #: 94-1 Filed: 10/28/16 Page 4 of 43 PageID #:882

```
 1   ALSO PRESENT:

 2

 3          Mr. Jerry D. Blakemore.

 4          Ms. Christine Nikolich, Legal Videographer,

 5               US Legal Support, Inc.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22   REPORTED BY:

23               DINA G. MANCILLAS, CSR, RPR, CRR, CLR

24               CSR No. 84-3400
```

Page 34

1    EEOC complaint with Rock County being settled, do

2    you have any understanding as to whether or not

3    that settlement also included a lawsuit such as

4    that reflected in Deposition Exhibit No. 2?

5         A.     I don't recall this lawsuit.  I

6    recall this being and thinking this was the EEOC,

7    but I must have been under --

8         Q.     Okay.

9         A.     -- the wrong impression, but clearly

10   it's something else.

11        Q.     Okay.  Are you currently employed?

12        A.     No, I am not.

13        Q.     When was the last time you were

14   employed?

15        A.     It would have been 2014, I believe.

16        Q.     When you were last employed, who was

17   your employer?

18        A.     I was a consultant, and I was doing

19   some work for an attorney out of Chicago.

20        Q.     What sort of consulting work were

21   you doing?

22        A.     I took consulting in policing,

23   police reform and expert witness.

24        Q.     Did you give any depositions as an

Case: 1:14-cv-01245 Document #: 94-1 Filed: 10/28/16 Page 6 of 43 PageID #:884

1    expert witness?

2         A.      Yes.

3         Q.      And what sort of case is that?

4         A.      That was the wrongful death case.

5                 And as I'm recalling now, that would

6    be an additional deposition.  There was one other

7    one that I gave in the Kafka case.

8         Q.      Okay.  In terms of your consulting,

9    would it be as an expert in police procedures?

10        A.      Sometimes.

11        Q.      Okay.  Was the wrongful death case

12   about police procedures with respect to the use of

13   force?

14        A.      No.

15        Q.      Did you write an expert report for

16   the wrongful death case?

17        A.      Yes.

18        Q.      And what attorney retained you as an

19   expert in the wrongful death case?

20        A.      Bernie Norville, I believe his last

21   name is.

22        Q.      And do you know the disposition of

23   that case or if it's still going on?

24        A.      They settled.

Donald Grady, 11    Case: 1:14-cv-01245 Document #: 94-1 Filed: 10/28/16 Page 7 of 43 PageID #:885    January 11, 2016

 1        Q.      And how long was your deposition?

 2        A.      It lasted most of the day.  So we

 3   started in the morning and finished, I believe,

 4   somewhere around 7:00 in the evening.

 5        Q.      Did you issue an invoice for your

 6   work as a consulting expert in that case?

 7        A.      I did.

 8        Q.      And do you recall how much money you

 9   earned as a consulting expert?

10        A.      Not throughout the entire course, I

11   do not.

12        Q.      Besides consulting with Bernie

13   Norville about that wrongful death case, did you

14   have any other consulting assignments?

15        A.      I did one short-term assignment in

16   the Democratic Republic of the Congo for the

17   United States State Department, Division of INL.

18        Q.      And how long did that consulting job

19   last?

20        A.      Approximately 30 days.

21        Q.      And what did you do?

22        A.      I did an assessment of the

23   Democratic Republic of Congo National Police and

24   made recommendations as to how they could move

1    forward with policing, training initiatives and

2    improving democratic policing in the Congo.

3         Q.      Was your client the United States

4    Department of State?

5         A.      It was.

6         Q.      And did you receive a fee for that

7    work?

8         A.      I did.

9         Q.      Do you recall how much that was?

10        A.      I don't recall the absolute amount,

11   no, I do not.

12        Q.      Do you have records with respect to

13   the fee earned as a consultant in the wrongful

14   death case and as a consultant to the U.S. State

15   Department?

16        A.      I have records for tax records, but

17   that would be about it.

18        Q.      And from those tax records, could

19   you divine the fees that you charged?

20        A.      I could tell you the hourly fees.

21        Q.      Sure.

22        A.      I charge $500 an hour for consulting

23   privately.  With the State Department, I make $68

24   and -- $68.68, or something along those lines,

1    plus per diem, travel and housing.

2          Q.      In connection with your work for the

3    U.S. State Department, did you travel to the

4    Congo?

5          A.      I did.

6          Q.      And how many days did you spend in

7    the Congo?

8          A.      Approximately two weeks.

9          Q.      And that was in 2014?

10         A.      I believe that's correct.

11         Q.      What was the name of your consulting

12   business?

13         A.      It's Grady Consulting Services.

14         Q.      And is that an LLC or a corporation?

15         A.      No, it is not.

16         Q.      What is it?

17         A.      It's a private proprietorship, sole

18   proprietorship.

19         Q.      Does it have any employees besides

20   yourself?

21         A.      No.  I have a partner.

22         Q.      Who's the partner?

23         A.      My wife Christine.

24         Q.      Did Grady Consulting Services issue

 1    any invoices other than the wrongful death case

 2    here in Chicago and the U.S. State Department work

 3    in Congo?

 4         A.     I don't recall what Christine's

 5    invoices would have been.  I believe she had some,

 6    but I don't recall what they were.

 7         Q.     And what sort of work did she do for

 8    the consulting business?

 9         A.     She's an expert witness, and she's

10    in the healthcare field.

11         Q.     Is that business still operating?

12         A.     It is.

13         Q.     Okay.  Does it -- have you had any

14    assignments in 2015?

15         A.     No.

16         Q.     Any assignments scheduled for 2016?

17         A.     No.

18         Q.     Any open files for your business at

19    this time?

20         A.     No.

21         Q.     What month in 2014 did you open that

22    business?

23         A.     I didn't open the business in 2014.

24         Q.     What year did you open the business?

```
 1          A.      2008.

 2          Q.      In 2013, did Grady Consulting

 3   Service have any projects?

 4          A.      Only with Bernie Norville.

 5          Q.      Was it a different case than this

 6   wrongful death case you told us about?

 7          A.      Same case.

 8          Q.      So you charged him for services in

 9   2013; you also charged him for services in 2014?

10          A.      That's correct.

11          Q.      What were the sum total of the

12   monies you received from Mr. Norville for the work

13   on that wrongful death case?

14          A.      I don't recall.

15          Q.      Would it be under 10,000 or over

16   10,000?

17          A.      Over 10,000.

18          Q.      Would it be over 50- or under

19   50,000?

20          A.      Over 50.

21          Q.      Would it be or under 75,000 or under

22   75,000?

23          A.      I don't know.

24          Q.      Okay.  What was the total that you
```

                                                        Page 41

 1     received from the U.S. State Department?  Your

 2     best estimate.

 3          A.      For the Congo?

 4          Q.      [Nonverbal response.]

 5          A.      I don't recall.

 6          Q.      Would it be under $20,000 or over

 7     $20,000?

 8          A.      I believe it was over 20,000.

 9          Q.      Would it be over 30- or under

10     $30,000?

11          A.      I don't recall.

12          Q.      Okay.

13                  MR. MAATMAN:  I'm going to show you

14     what I've had marked as Exhibit No. 3 for

15     identification.

16                          (Grady Deposition Exhibit 3 was

17                           marked for identification.)

18                          (Document tendered.)

19     BY MR. MAATMAN:

20          Q.      I believe it's five pages, and it

21     purports to be a printout from something known as

22     Grady Consulting Services off of a server,

23     "gradyconsultingservices.com."

24                  Do you see that?

Page 196

1       A.      Yeah.   I remember signing a few

2   documents.

3       Q.      Okay.

4       A.      I don't remember exactly what they

5   were, but...

6                       (Grady Deposition Exhibit 8 was

7                        marked for identification.)

8                       (Document tendered.)

9   BY MR. MAATMAN:

10      Q.      I'm showing you a document that's

11  marked Deposition Exhibit No. 8 for

12  identification, which purports to be a document

13  signed by you on November 12, 2001, regarding an

14  acknowledgement as to an awareness of NIU policies

15  regarding nondiscrimination.

16                  Do you recall this?

17      A.      Yes.

18      Q.      Was this one of the array of

19  new-hire forms that you were asked to review and

20  sign?

21      A.      Yes.

22      Q.      Were you aware, as a result of

23  signing Deposition Exhibit No. 8, that there was

24  an internal complaint process at NIU if anyone had

1        Q.       After you had revised the document,

2    did anyone at the university change any of your

3    revisions?

4        A.       No.

5        Q.       After you revised the document, as

6    far as you were concerned, did it accurately state

7    how you were functioning as police chief?

8        A.       I believe so.

9        Q.       Let me show you what's marked as

10   Exhibit No. 11 for identification.

11                         (Grady Deposition Exhibit 11 was

12                          marked for identification.)

13                         (Document tendered.)

14   BY MR. MAATMAN:

15       Q.       Is this the job description that you

16   revised?

17       A.       It appears to be.

18       Q.       And this is the job description that

19   you said accurately reflects your duties and your

20   job?

21       A.       I believe it is.

22       Q.       When was this revised?

23       A.       I don't recall the date of when I

24   revised it.  It would have been early in my tenure

1    Staff Council have anything to do with the

2    procedures?

3                  Supportive Professional Staff is

4    advised in assisting to write the rules and

5    regulations as they relate to supportive

6    professional staff.

7    BY MR. MAATMAN:

8         Q.      You were a supportive professional

9    staff?

10        A.      That's correct.

11        Q.      And so the process agreed to by the

12   SDC Council [sic] was something you were a

13   beneficiary of?

14        A.      The SPS Council?

15        Q.      Uh-huh.

16        A.      I don't know if I was a beneficiary

17   of it, but it applied to me.

18        Q.      Did you have any direct involvement

19   with the SPS Council?

20        A.      No, I did not.

21        Q.      To your knowledge, did you act in

22   any way inappropriately with respect to the hiring

23   of the former Colorado State University police

24   chief?

 1    for your job to be terminated or to be suspended

 2    or put on leave?

 3         A.       I wasn't expecting anything except

 4    to talk to Bill Nicklas about the fact that he was

 5    now the new supposed director of police and public

 6    safety.

 7         Q.       Did the decision to put -- have that

 8    computer information put in the flash drive have

 9    anything to do about your upcoming meeting with

10    Mr. Nicklas?

11         A.       No, it did not.  I had a scheduled

12    computer change-out that had been scheduled weeks

13    before this, like six, eight weeks before.  And I

14    was told that the computer would be in on Monday.

15              So I was merely preparing for my

16    computer to come in on Monday so that I could

17    immediately plug it in and go to work.

18              MR. MAATMAN:  I'm going to have the

19    court reporter to mark as Exhibit 14 this next

20    letter.

21                        (Grady Deposition Exhibit 14 was

22                         marked for identification.)

23                        (Document tendered.)

24

Donald Grady, II                               January 11, 2016

Page 417

1    BY MR. MAATMAN:

2         Q.      Do you recall this letter?

3         A.      Yes, I do.

4         Q.      How did you receive this letter?

5         A.      It was handed to me in an envelope

6    by Bill Nicklas on the morning of November 10th,

7    of 2012.

8         Q.      Was it handed to you in person?

9         A.      It was handed to me in person.

10        Q.      Were the contents of the letter

11   discussed with you before it was handed to you?

12        A.      Not exactly.

13        Q.      What happened?

14        A.      I was told about certain things that

15   supposedly were contained in the letter, but the

16   things that were told and what was in the letter

17   differ somewhat.

18        Q.      In what respect?

19        A.      Well, in the respect that I was told

20   to immediately remove everything from my office.

21   It doesn't say in here that I'm to remove all of

22   my personal items from my office, but I was told

23   very clearly that I would remove all personal

24   items.

Donald Grady, II                          January 11, 2016

                                                    Page 420

1    from home that night?

2            A.      Access which computer from home?

3            Q.      Your NIU computer.

4            A.      I never had an NIU computer at home.

5            Q.      Okay.  You had a BlackBerry?

6            A.      Not from NIU.

7            Q.      Okay.  You had your own personal

8    BlackBerry that had NIU e-mails on it?

9            A.      E-mail on it.

10           Q.      Okay.  Did you send any e-mails that

11   night?

12           A.      No, I did not.

13           Q.      Okay.  Did you make any phone calls

14   to any of your colleagues that night?

15           A.      Not that I recall.

16           Q.      Did you talk with any of your

17   colleagues that night?

18           A.      Not that I recall.

19           Q.      Okay.  You stayed quiet about it?

20           A.      I was in no mood for conversation at

21   that time.

22           Q.      Okay.

23           A.      I guess that answer would be...

24           Q.      Let me show you what's been marked

Page 421

 1   as Exhibit 15.

 2                          (Grady Deposition Exhibit 15 was

 3                           marked for identification.)

 4                          (Document tendered.)

 5   BY MR. MAATMAN:

 6        Q.      Do you recall receiving this

 7   document?

 8        A.      I do.

 9        Q.      Do you recall about what date you

10   received this document?

11        A.      I don't recall exactly, but I think

12   it was in close proximity to the date that it's

13   listed as being authored here.

14        Q.      On or around November 28, 2012?

15        A.      On or around, in that approximate.

16        Q.      Are there any aspects of this

17   three-page document that are false?

18        A.      The entire document, in my opinion,

19   is false.

20        Q.      Okay.  Is there any aspect of that

21   document that's truthful?

22        A.      Sure.  He quotes Section 6 of my

23   contract.  That's, I think, a direct quote.  He

24   quotes Section 7 of my contract or my letter of

1                    CERTIFICATE

2                        OF

3                SHORTHAND REPORTER

4

5            I, DINA G. MANCILLAS, a Certified

6    Shorthand Reporter of the State of Illinois,

7    CSR License No. 084-003400, do hereby certify:

8                That previous to the commencement of

9    the examination of the aforesaid witness, the

10   witness was duly sworn and/or duly affirmed by me

11   to testify the whole truth concerning matters

12   herein;

13                That the foregoing deposition

14   transcript was stenographically reported by me and

15   was thereafter reduced to typewriting under my

16   personal direction and constitutes a true and

17   accurate record of the testimony given and the

18   proceedings had at the aforesaid deposition;

19                That the said deposition was taken

20   before me at the time and place specified;

21                That I am not a relative or employee

22   or attorney or counsel for any of the parties

23   herein, nor a relative or employee of such

24   attorney or counsel for any of the parties hereto,

Donald Grady, II                                    January 11, 2016

Page 448

1     nor am I interested directly or indirectly in the

2     outcome of this action.

3                    IN WITNESS WHEREOF, I do hereunto

4     set my hand at Chicago, Illinois, this 2nd day of

5     February, 2016.

6

7

8

9

10    _____

11            DINA G. MANCILLAS, CSR, RPR, CRR, CLR

12            CSR LICENSE NO. 084-003400

13

14

15

16

17

18

19

20

21

22

23

24



# Northern Illinois University
## Center for Affirmative Action
## & Diversity Resources

**AADR**

---

### ACKNOWLEDGEMENT and INTRODUCTION to and AWARENESS of NIU POLICIES and STANDARDS for FAIRNESS in EMPLOYMENT and EDUCATIONAL PROGRAMS

---

1. Today I received a *Quick Reference Guide to the Non-Discrimination, Sexual Harassment Prevention, Non-Retaliation Policies and Complaint Resolution Procedures.* I understand that upon request, I can receive a complete version of the Policy from the Center for Affirmative Action and Diversity Resources. Additionally, as the Policy is amended and\or updated, it will become available on the Human Resource Services website.

2. Today I received a training briefing about the Northern Illinois University program and policies for assuring fair treatment of individual employees and students administered by the Center for Affirmative Action and Diversity Resources in Human Resource Services.

3. I recognize and understand that staff in the Center for Affirmative Action and Diversity Resources provide assistance to university employees and/or students who believe that they have been ill-treated due to their race, color, sex, age, disability, national origin, religion, sexual orientation, veterans status, marital status, or political affiliation.

4. I acknowledge that this signed form will be placed in my departmental personnel record, and at NIU Human Resource Services.

---

Employee Signature

Donald Grady                                              11/12/a
Name (please print)                                       Date

Department of Public Safety
Department Name

SPS

Grady    EXHIBIT 8
FOR I.D.  1-11-16  DM

## Northern Illinois University Department of Public Safety
## Chief of Police and Public Safety Position Description

**Current Title: Chief of Police and Public Safety**

**Department: Public Safety**

**Position Category: Exempt**

**Position Number:    4240**

### Function:

The position of Chief of Police and Public Safety is an executive level command position with full executive law enforcement authority. The Chief of Police and Public Safety has the responsibility for leading and managing the activities and personnel of the Department of Public Safety. He or she is responsible for recruitment and retention, evaluates subordinate personnel, develops and ensures compliance with department rules, regulations, policies and procedures and fosters high levels of discipline and morale within the individuals working for the organization. The Chief of Police and Public Safety creates reports and other official documents, analyzes problems, engages in strategic planning and problem solving and makes disciplinary decisions regarding personnel issues. He or she also protects the safety and security of persons, property, equipment and facilities, and protects and preserves individual civil rights in and around Northern Illinois University controlled properties. The Chief of Police and Public Safety enforces all applicable Federal, State and local laws, rules, regulations and University policies and procedures. The Chief of Police and Public Safety is responsible for maintaining the public peace and order and assisting in facilitating the adjudication of infractions of the University judicial Code and State or Federal Criminal or Civil Code violations.

### Organizational Relationship:

The Chief of Police and Public Safety is required to function autonomously. He or she reports to the Executive Vice President and Chief of Operations. The Executive Vice President and Chief of Operations reports to the University President. The Chief of Police and Public Safety is the Director of Emergency Operations in times of crisis or disaster.

### Duties and Responsibilities:

The duties and responsibilities of the Chief of Police and Public Safety include but are not limited to:

Grady    EXHIBIT  11
FONID    1·11·16    DM

1. Manages and directs the activities of the agencies commanders, supervisors and those performing patrol, investigative or administrative functions. And he or she ensures compliance with all agency rules, regulations, policies and procedures.
2. Develops the department's budget and manages the finances for the agency.
3. Engages in strategic planning, organizational development processes and implements activities for effective project management.
4. Develops curricula, course descriptions, outlines, lesson plans and other materials for the presentation of in-service courses, concurrent training activities and public education classes.
5. Oversees the operations of the various divisions and the accreditation process.
6. Develops policies, procedures, rules and regulations.
7. Develops and maintains employee performance records, provides personalized guidance and support and conducts employee evaluations while maintaining employee morale and esprit de corps.
8. Develops agency reports and other official documents or memoranda.
9. Analyzes community problems, develops preventative strategies and engages in proactive problem solving initiatives.
10. Makes decisions relative to personnel practices including the hiring, promotion and discharge of agency employees.
11. Prevents death or injury and protects property while preserving the public peace, order and tranquility through the use of sophisticated technologies, aggressive mobile and foot patrols, covert and overt surveillance initiatives and the employment of appropriate investigative strategies.
12. Ensures the fair and impartial enforcement of State criminal, traffic and motor vehicle laws, and adopted edicts from the University Board of Trustees through the comprehensive knowledge and understanding of the Illinois State Statutes and the University's policies, procedures, rules and regulations and how they should be applied.
13. Ensures the collection of information relative to civil and criminal investigations, the preparation of cases for court and the preparation of detailed reports related to agency assigned complaints. Communicates the outcomes of investigations to senior university officials in formal and informal settings effectively, both orally and in writing.
14. May direct motor vehicle and pedestrian traffic, conduct motor vehicle accident investigations, prepare required state motor vehicle accident reports and maintain complete accurate, articulate accident investigation documents.
15. May engage in foot or mobile patrol activities, respond to alarms, handle emergency complaints, serve warrants or engage in self-initiated police activities and the transporting of prisoners.
16. Under limited circumstance may have to operate and maintain department equipment in accordance with agency policy and procedures including but not limited to: emergency vehicles, RADAR, LIDAR or other speed measuring devices, breath/alcohol analyzers, mobile computing systems, automated defibrillators and office machines.
17. Occasionally conduct building security checks and engage in parking regulation enforcement.

18. Promotes exceptional relationships with the university community, the City and County of DeKalb and State of Illinois officials.
19. The Chief of Police and Public Safety assists other jurisdictions upon request in non-emergency or emergency circumstances as provided for in agency policies and mutual assistance agreements.
20. Performs other duties as may be required by the Executive Vice President and Chief of Operations.

**Factor Analysis**

**Required Knowledge:**

The Chief of Police and Public Safety must possess a comprehensive understanding of the State of Illinois Criminal Code, Illinois Vehicle Code and the policies, procedures, rules and regulations of the university. He or she must have a good understanding of the human anatomy and current life supporting interventions and practices. The Chief of Police and Public Safety is required to have a thorough knowledge and understanding of how to engage in effective mediation, facilitation, negotiation, and de-escalation activities. He or she must have the cognitive capacity to read, understand, interpret and apply appropriate legal texts and academic documents that provide information necessary to develop the knowledge and skills previously mentioned and to be able to impart that knowledge in the development of his or her subordinates.

**Responsibility:**

Supervisory Controls: The Chief of Police and Public Safety is an autonomous executive who works under the limited direction of the Executive Vice President and Chief of Operations. He or she is responsible for the answering of calls for emergency service as may be required to protect the lives, safety or property of university faculty, staff, students or visitors. The Chief of Police and Public Safety assumes command of emergency circumstances and engages in significant self-initiated executive activities. His or her duties and responsibilities are varied and demand a variety of responses. While command influence is occasionally utilized, in many instances priorities and deadlines will be dictated by the circumstance. The Chief of Police and Public Safety must have the intellectual ability to be flexible, adaptable and creative enough to apply appropriate remedies to unusual, volatile and often stressful situations while directing the activities of other command personnel. The Executive Vice President and Chief of Operations evaluates the Chief of Police and Public Safety's performance based upon the outcomes he or she produces. The Chief of Police and Public Safety is expected to follow the agency's general orders in carrying out his or her everyday duties and responsibilities.

Guidelines: The Chief of Police and Public Safety works under parameters established by department and university policies, procedures, rules and regulations. The need for autonomy makes reliance upon these edicts a necessary and indispensable part of the profession.

**Difficulty:**

Complexity: Virtually every activity the Chief of Police and Public Safety engages in is interconnected. Nearly all police executive activities involve important direct or indirect personal contacts and have the potential for impacting large numbers of people. The responsibility for commanding emergency personnel in circumstances of crisis further complicates issues. Every situation is different. The job demands the practitioner be flexible and adaptable.

Scope and Effect: The Chief of Police and Public Safety has a direct impact on significant numbers of people daily. He or she encounters a diversity of people ranging from the uneducated homeless to the university professor with a Ph.D. Contact may be initiated through scheduled meetings, a course of instruction, a response to an emergency or a non-emergency call for service. The Chief of Police and Public Safety has an immediate and direct impact on the people he or she commands.

**Personal Relationships:**

Personal Contacts: The Chief of Police and Public Safety comes into contact with a variety of people each day. He or she is expected to interact with students, faculty, staff and visitors throughout the course of their daily activities. Incumbents in this position must have the ability to effectively communicate, orally and in writing, with people from all walks of life.

Purpose for Contact: The purposes for contact varies from administrative meetings and client initiated calls for service to emergency conditions including sexual assaults or the arrest of an armed violent offender. They also have regular contact with those they have command responsibilities for.

**Environmental Demands:**

Physical Requirements: The Chief of Police and Public Safety may be required to exert his or herself with no prior notification. In emergency circumstances he or she may be required to run up several flights of stairs and then provide emergency medical attention to include CPR for an extended period of time. The Chief of Police and Public Safety may have to get on his or her knees, bend over a person and provide effective chest compressions for up to ten (10) minutes without relief. He or she must be able to perform both at exceptional physical and cognitive levels. Persons working in this capacity must be able to assess a situation and make appropriate decisions regarding the use of available resources and appropriate responses while directing the activities of others.

The Chief of Police and Public Safety may in some instances be required to chase an on-foot-fleeing suspect for several hundred meters and then engage in unassisted hand-to-hand combat for two (2) to three (3) minutes or more. Offenders can range in weight

from ninety (90) pounds to in excess of two hundred fifty (250) pounds or more. These encounters can be life threatening and require the pursuer to be able to protect him or herself until assistance can arrive. The Chief of Police and Public Safety must be able to think clearly in a crisis. He or she must have a sufficient intellectual capacity to remain in control while managing stressful circumstances and the people under his or her command.

Work Environment: The Chief of Police and Public Safety may be required to work in a variety of conditions. He or she may have to be out in sub-zero conditions or temperatures above 90 degrees. He or she may also be required to wear protective clothing that exacerbates body temperatures in extreme heat. The Chief of Police and Public Safety may, on limited occasion, be confined to spaces that afford limited mobility for extended periods or have to remain in a classroom for up to ten (10) hours per day.

The Chief of Police and Public Safety may be required to enter areas filled with smoke or other toxins. He or she may be required to enter tight places or areas that have low light conditions. Persons in this classification may occasionally be required to work at night, during a weekend or on a holiday.

## Comments

The job of the Chief of Police and Public Safety can be unpredictable. He or she may be required to engage in extremely stressful and strenuous activities on a moment's notice. While many of the activities listed above will not occur on a regular basis the Chief of Police and Public Safety must be prepared to undertake them at any given time. The position can be extremely demanding requiring more than average physical and mental conditioning. The Chief of Police and Public Safety must not suffer any physical or mental condition that could impair his or her ability to perform the required duties and responsibilities of the position or that would compromise his or her safety or endanger another.

The Chief of Police and Public Safety may be exposed to loud noises as a result of the use of firearms or other circumstances where excessive noise may exist. He or she must have good hearing and not suffer a deficit that is not correctable that may compromise their safety or that of another.

The Chief of Police and Public Safety must have good vision. He of She must not suffer any visual deficit that is not correctable that could interfere with their ability to perform the duties and responsibilities of the position or jeopardize their safety or that of another.

**Chief of Police and Public Safety Signature Page:**

Donald Grady
Chief of Police and Public Safety

02\15\11

Date

Eddie R. Williams
Executive Vice President and Chief of Operations

2/21/11

Date



**Northern Illinois University**
*Office of the President*

John G. Peters President
Altgeld Hall 300
DeKalb, Illinois 60115-2828
815-753-9500
Fax 815-753-8686
www.niu.edu

November 10, 2012

Mr. Donald Grady
Chief of Police and Public Safety
Northern Illinois University
DeKalb, Illinois 60115

Dear Chief Grady:

This is to notify you that effective immediately, you are hereby placed on paid administrative leave pending a final disposition of the matters outlined below. In addition to receiving your compensation during the administrative leave, you will continue to accrue all benefits as well. Your authority to serve and represent the university in the capacity of Chief of Police and Public Safety, including any authority or responsibility related to the Department of Public Safety, along with all related authorities and privileges pertaining to University Police operations are withdrawn. Furthermore you are not authorized to provide any instruction, direction, or to seek information from any personnel of the Department. During the administrative leave, you will not have access to your office or any University Police Department and related facilities. Police equipment and identifications, any and all records, devices, and access keys for the Department of Public Safety or other university facilities must be returned to the Department of Public Safety within 24 hours of this notification. Should you need to enter the Public Safety facility, a visit must be authorized and pre-arranged through my office in my capacity of Acting Director of Public Safety. You will be allowed limited access to your office to remove any personal effects which you may need during the duration of your leave; however, if additional issues or needs arise during the term of the administrative leave, you should coordinate those directly with me. For the duration of the paid administrative leave, your availability to provide information pertaining to the Department of Police and Public Safety upon request by my office is a condition of the paid leave and such information should be provided to me directly. Additionally, during any period of paid administrative leave you are obligated to cooperate as

Grady
EXHIBIT 14
FONTE 1-11-16 DM

*Learning Today, Leading Tomorrow*
Northern Illinois University is an Equal Opportunity/Affirmative Action Institution.

CONFIDENTIAL

NIULIT00000 **NIUPROD0000**

requested in association with any internal or external investigation or review of the Department of Police and Public Safety and/or University Police operations.

Pursuant to Section 14 of the Letter of Agreement, dated May 23, 2008, between you and Northern Illinois University ("University"), this correspondence notifies you that the University intends to initiate action under the Letter of Agreement based upon the breach of your duties and responsibilities under Section 6, and your violation of rules and regulations under Section 7 of your Letter of Agreement. Specifically, the decision, at a minimum, results from your conduct and that of your officers with respect to the matter of *The People of the State of Illinois vs. Andrew Rifkin,* and recent failures to make appropriate internal and external disclosures.

With respect to the *Rifkin* matter, the recent findings by the Honorable Judge Robbin J. Stuckert, concerning the failure of the Police Department to make mandatory *Brady* disclosures in that criminal action, are troubling and reveal a failure on multiple levels to comply with the law and to satisfy basic and fundamental investigation requirements. Not only did you personally meet with the witnesses whose statements needed to be turned over to the State's Attorneys, but an officer working under your supervision also committed unacceptable errors and omissions with respect to the written witness interviews obtained in that case. The Judge found that these acts were, "a clear and obvious Brady violation" and "a purposeful hiding of information by this department."

This incident alone constitutes a breach of your obligations under Section 6 and 7 of your Letter of Agreement. In addition, these actions constitute grounds under Sections 14(A) and 14(B) of your Letter of Agreement. Specifically, these actions constitute "just cause" under Section 14(B)(i) as deliberate and/or serious violations of your duties and responsibilities both as outlined in the Agreement and in the University's Rules and Regulations.

Prior to making a final decision on discipline, the University will provide you with written notice and statement of the charges against you, along with a summary of the evidence supporting those charges. You will be entitled to appropriate meetings and opportunities to respond to the charges in accordance with applicable due process procedures and you may present any evidence you believe should be considered by the University before a final disciplinary decision is implemented.

*Learning Today,* **Leading Tomorrow**

CONFIDENTIAL

NIULIT000043
**NIUPROD00000**

This notice is being provided pursuant to Section 26 of the Agreement. A Statement of Charges will be provided before any further action is taken and you also will be provided with information concerning the Grievance Procedures for Faculty and Staff in the event you disagree with subsequent disciplinary measures.

Sincerely,

F. William Nicklas, Acting Director of Public Safety

Cc: John G. Peters, President
    Jerry D. Blakemore, Vice President and General Counsel
    Steve Cunningham, Vice President Administration

*Learning Today,* **Leading Tomorrow**

CONFIDENTIAL

NIULIT000044
**NIUPROD00000**

Northern Illinois University

### Written Charges for Discipline / Discharge
Donald Grady II – Chief of Police and Public Safety
November 28, 2012

## I   Brief Summary of Background Facts

Northern Illinois University (the "University") is considering disciplinary action, up to termination, against Donald Grady II, Chief of Police and Public Safety at the University ("Chief Grady"). Chief Grady currently has been placed on administrative leave pending further investigation and a decision with respect to an appropriate level of discipline.

Grounds for disciplinary action arise out of events and circumstances related to the case of *The People of the State of Illinois vs. Andrew Rifkin*, Case No. 11CF762, and actions and omissions arising out of and related to that proceeding. Specifically, certain findings were made by the Court in that case which compromise the reputation and effectiveness of the Department of Public Safety (the "Department") and call into question the supervision of Department employees and compliance with basic legal principles of criminal justice. The findings of the Court concern specifically the investigation conducted by University police into allegations of sexual assault against a former officer of the Department, and the failure of the Department to timely turn over potentially exculpatory evidence to the DeKalb States Attorney. Both Chief Grady and Lieutenant Kartik Ramakrishnan were personally involved in the investigation and both had personal interaction with witnesses in the case.

Disciplinary action also is being considered with respect to Chief Grady's conduct in failing to timely notify his direct report at the University with respect to the inquiry by the Court into the conduct of University officers in the *Rifkin* matter, and also with respect to Chief Grady's conduct subsequent to the hearings held by the Court and prior to being placed on administrative leave.

## II.   Relevant Contractual Provisions

Chief Grady and the University are parties to a Letter of Agreement, dated May 23, 2008, which describes the terms of his employment. The contractual provisions relevant to the disciplinary matters under consideration include:

6.   Duties and Responsibilities. – In your position as Chief of Police and Public Safety, you will be responsible and directly accountable for all operations of the university department of Public Safety and related mission and operations including, without limitation, those duties which appear on your position description and those which may be assigned, from time to time by the Executive Vice President and Chief of Operations. In addition, you are responsible for assuring that legal requirements, rules and regulations affiliated with the control of Police Operations are constantly maintained, whether referred to in this Letter of Agreement or not. Your duties will also include your continued work to integrate the Public Safety mission into the spectrum of academic life to

CONFIDENTIAL

Grady
EXHIBIT 15
FORM   ·||·16 DM

NIULIT000045
**NIUPROD00001!**

complement the University and its mission in the community, region and the State of Illinois.

7.     _Violations of Rules and Regulations_ – If the Employee is found to be in violation of applicable rules and regulations, the Employee shall be subject to disciplinary or corrective action. The Employee may be suspended for a period of time, without pay, or the employment of the Employee may be terminated as provided in Paragraphs 14 and 15 below if the Employee is found to have been involved in serious or intentional violations of legal standards or Board of Trustees or University rules or regulations.

2(C).   Notwithstanding anything contained herein, should you be in breach of any portion of this Letter of Agreement or your annual contract then, naturally, your contract can be terminated before the four-year period, or an extension thereof ends.

14(B). This Agreement or the aforementioned Letter of Appointment may be terminated at any time by University for just cause.   For purposes of this Agreement, "just cause" may include, without limitation the following:

       i.      Deliberate and/or serious violations of the duties and responsibilities outlined in this Agreement, the Notice of Appointment, or other University rules and regulations.

       ii.      Prolonged absence from duty with or without consent of your supervisor, except as provided by the federal Family and Medical Leave Act.

### III.     Grounds for Breach of Contract

The University currently is investigating potential grounds for discipline against Chief Grady, including:

- Whether Chief Grady complied with his contractual obligation to assure that legal requirements, rules and regulations affiliated with the control of Police Operations were appropriately maintained. (Section 6)

- Whether Chief Grady was involved in serious or intentional violations of legal standards applicable to the operation of the department he supervised. (Section 7)

- Whether Chief Grady was in violation of applicable rules and regulations of the University. (Section 7)

- Whether Chief Grady failed to exercise appropriate supervisory control over officers in the Public Safety Department to ensure the timely turn-over of relevant evidence in the _Rifkin_ matter.

130474629v1 0939078

CONFIDENTIAL

NIULIT000046
**NIUPROD00001-**

- Whether Chief Grady exercised appropriate oversight and supervision of operations of the Department. (Section 6)

- Whether Chief Grady failed to keep his direct report informed of developments in the *Rifkin* case and of the potential for sanctions and/or investigation of the Department.

- Whether a Department officer under the supervision of Chief Grady informed witnesses in the *Rifkin* matter that their statements would not be turned over to the States Attorney of DeKalb County if they wished not to be involved in the proceedings.

- Whether Chief Grady, without notice to his direct report or other executive staff, accessed his University-issued laptop and deleted and/or copied all or substantially all of the files on the University-issued laptop.

- Whether the foregoing conduct constituted a violation of the Illinois Computer Crime Prevention Law, 720 ILCS 5/16D-1, and/or any University computer or information technology resources policy.

- Whether the foregoing constitute cause under Section 14 of the Letter of Agreement.

IV.     **On-Going Investigation and Additional Charges**

The University reserves the right to add additional charges as it completes its investigation.

3

130474629v1 0939078

## Donald Grady II, Ph.D.
3131 Fairway Oaks Drive
DeKalb, IL 60115
(815) 754-9696

January 31, 2013

F. William Nicklas, Director of Police and Public Safety
Northern Illinois University
395 Wirtz Drive
DeKalb, Illinois 60115
nicklas@niu.edu

Mr. Nicklas,

I have made an effort to address NIU's implied allegations relative to the University's intent to terminate my employment. Your letter of January 9, 2013 did not provide sufficient information for me to do so effectively. The allegations as stated merely set forth in general terms your scope of investigation, without stating what, if anything, I specifically did, or failed to do, or to delineate any definitive behavior requiring correction.

Your letter did not identify which of the general allegations you claimed to be investigating was determined to be a basis for terminating my contract. Neither, did you outline what behavior in any of the situations referred to in your letter was found to be inappropriate. The vagueness of the allegations set forth in your letter made it difficult, at best, if not altogether impossible for me to provide you with information or evidence to either substantially mitigate or to refute any performance issue alluded to in your correspondence.

I have previously set forth my objections to the characterization of this February 1, 2013 meeting as one that fulfills the pre-termination requirements set forth in the United States Constitution applicable to me as a person who has both a liberty and a property interest in my job and who is entitled to notice and an opportunity to be heard before any decision to discipline or terminate is made. I have written to you stating that the communications I have received from NIU have not sufficiently particularized any conduct on my part that would arguably constitute cause for my termination. I have also requested clarification as to what it is that I am perceived to have done either intentionally or negligently that would warrant the termination of my employment. Having not received further clarification and having been informed that this meeting is to be my pre-termination meeting pursuant to *Cleveland Board of Education v. Loudermill*, ___ ___ ___ (1985), I am providing you with the information I can, under the circumstances, related to the topics NIU indicated it was investigating. Thus while maintaining my objections as set forth in previous correspondence to Mr.

Grady 1.11.16

Page 1 of 2

CONFIDENTIAL

NIULIT000063

Nicklas and NIU counsel, I am providing you with the attached document. It contains information I hope will be helpful in clarifying the situations referred to in NIU's correspondence related to its investigation.

I continue to be greatly concerned that the severe action the University appears intent on taking is not related to some fault or impropriety on my part, but rather is based on unjust, illicit, discriminatory, and/or retaliatory considerations.

If you should have any questions or require further information I remain ready to provide assistance where I can.

Sincerely,

Donald Grady II, Ph.D.

CONFIDENTIAL

NIULIT000054

**Responses to Northern Illinois University's**
**Identified Topics of Investigation Related to Potential Discipline**

- Whether Chief Grady complied with his contractual obligation to assure that legal requirements, rules and regulations affiliated with the control of police operations were appropriately maintained. (Section 6)

Section 6, Duties and Responsibilities, of the Letter of Agreement states: *--In your position as Chief of Police and Public Safety, you will be responsible and directly accountable for all operations of the university department of Public Safety and related mission and operations including, without limitation, those duties which appear on your position description and those which may be assigned, from time-to-time by the Executive Vice President and Chief of Operations. In addition, you are responsible for assuring that legal requirements, rules and regulations affiliated with the control of Police Operations are constantly maintained, whether referred to in this Letter of Agreement or not. Your duties will also include your continued work to integrate the Public Safety mission into the spectrum of academic life to complement the University and its mission in the community, region and the State of Illinois.*

1. There has been only one court ruling citing a violation of any legal requirement, rule or regulation during Chief Grady's eleven and one half years of managing the Department of Police and Public Safety.
2. Department of Police and Public Safety policy requires officers to turn over investigative files, statements, and information to the State's Attorney in a timely manner.
3. Lieutenant Kartik Ramakrishnan, while under oath, clearly stated that he had made a mistake and that he understood the Department policy to provide information to the State's Attorney in a timely manner.
4. Lieutenant Ramakrishnan accepted complete responsibility for having failed to provide the statements to the State's Attorney.
5. The Lieutenant was disciplined by Chief Grady to ensure there would be no further violations of that sort, which is entirely consistent with the mandate to assure the maintenance of legal requirements, rules and regulations.

- Whether Chief Grady was involved in serious or intentional violations of legal standards applicable to the operation of the department he supervised. (Section 7)

Section 7, Violations of Rules and Regulations, of the Letter of Agreement states: *--If the Employee is found to be in violation of applicable rules and regulations, the Employee shall be subject to disciplinary or corrective action. The Employee may be suspended for a period of time, without pay, or the employment of the*

*Employee may be terminated as provided in Paragraphs 14 and 15 below if the Employee is found to have been involved in serious or intentional violations of legal standards or Board of Trustees or University rules or regulations.*

1. The court did not find Chief Grady culpable with regard to the Brady violation in the Rifkin case or that the Chief acted improperly in any way.
2. The Rifkin case had not gone to trial and the defendant did not experience any adverse consequences as a result of the delay in acquiring the statements.
3. The transfer of information from Chief Grady's computer to an external storage device was completed in accordance with past University practices and existing protocols used by University IT personnel on numerous occasions within the Department of Police and Public Safety.
4. The transfer was executed by IT personnel, not Chief Grady.
5. No computer files were damaged or destroyed and no files were removed from Chief Grady's laptop computer.
6. Chief Grady has permission from his direct report Dr. Eddie Williams to co-mingle and maintain personal files and records on his University computer as their use in presentations and document development could provide value to the University and other institutions of higher education. This agreement was reiterated in August 2006 when Chief Grady accepted an assignment as the Senior Advisor to the Minister of Interior in Iraq.
7. Nothing delineated in this document reflects what could be considered to be a serious violation of any legal standard or an intentional violation of any legal standard or University rule or regulation by Chief Grady.

- Whether Chief Grady was in violation of applicable rules and regulations of the University. (Section 7)

Section 7, Violations of Rules and Regulations, of the Letter of Agreement states: *--If the Employee is found to be in violation of applicable rules and regulations, the Employee shall be subject to disciplinary or corrective action. The Employee may be suspended for a period of time, without pay, or the employment of the Employee may be terminated as provided in Paragraphs 14 and 15 below if the Employee is found to have been involved in serious or intentional violations of legal standards or Board of Trustees or University rules or regulations.*

1. The court did not find Chief Grady culpable with regard to the Brady violation in the Rifkin case or that the Chief acted improperly in any way.
2. The Rifkin case had not gone to trial and the defendant did not experience any adverse consequences as a result of the delay in acquiring the statements.

3. The transfer of information from Chief Grady's computer to an external storage device was completed in accordance with past University practices and existing protocols used by University IT personnel on numerous occasions within the Department of Police and Public Safety.

4. The transfer was executed by IT personnel, not Chief Grady.

5. No computer files were damaged or destroyed and no files were removed from Chief Grady's laptop computer.

6. Chief Grady has permission from his direct report Dr. Eddie Williams to co-mingle and maintain personal files and records on his University computer as their use in presentations and document development could provide value to the University and other institutions of higher education. This agreement was reiterated in August 2006 when Chief Grady accepted an assignment as the Senior Advisor to the Minister of Interior in Iraq.

7. Nothing delineated in this document reflects what could be considered to be a serious violation of any legal standard or an intentional violation of any legal standard or University rule or regulation by Chief Grady.

- Whether Chief Grady failed to exercise appropriate supervisory control over officers in the Public Safety Department to ensure the timely turn-over of relevant evidence in the *Rifkin* matter.

    1. Department of Police and Public Safety policy and standard operating procedures requires officers to turn over investigative files, statements, and information to the State's Attorney in a timely manner.

    2. Chief Grady had no reason to believe that Lieutenant Ramakrishnan had not followed his instructions or the department's protocol to turn over information in his possession related to the Rifkin case as required.

    3. Lieutenant Kartik Ramakrishnan, while under oath, clearly stated that he had made a mistake and that he understood the Department policy to provide information to the State's Attorney in a timely manner.

    4. Lieutenant Ramakrishnan accepted complete responsibility for having failed to provide the statements to the State's Attorney.

    5. Chief Grady was unaware his instructions and departmental policy had not be followed as required until mere days before the hearing.

    6. The Lieutenant was disciplined by Chief Grady to ensure there would be no further violations of that sort, which is entirely consistent with the mandate to assure the maintenance of legal requirements, rules and regulations.

- Whether Chief Grady exercised appropriate oversight and supervision of operations of the Department. (Section 6)

Section 6, Duties and Responsibilities, of the Letter of Agreement states: *--In your position as Chief of Police and Public Safety, you will be responsible and directly accountable for all operations of the university department of Public Safety and related mission and operations including, without limitation, those duties which appear on your position description and those which may be assigned, from time-to-time by the Executive Vice President and Chief of Operations. In addition, you are responsible for assuring that legal requirements, rules and regulations affiliated with the control of Police Operations are constantly maintained, whether referred to in this Letter of Agreement or not. Your duties will also include your continued work to integrate the Public Safety mission into the spectrum of academic life to complement the University and its mission in the community, region and the State of Illinois.*

1. Chief Grady's direct report Dr. Eddie Williams has repeatedly told officials from other universities, NIU administrators, community members and others that NIU has one of the finest police departments in the country, or words to that affect.
2. Dr. Williams has told Chief Grady on numerous occasions and as recently as October of 2012 that he (Dr. Williams) knew that NIU were the best trained, best educated and most diverse university police department anywhere, or words to that affect.
3. Chief Grady has been the recipient of several awards for his performance as Chief of Police while at NIU.
4. Chief Grady has never been given any indication from Dr. Williams that he was concerned about the operation of the NIU Police Department and there are no negative evaluations in Chief Grady's file to suggest operational deficiencies.
5. Nothing delineated in this document reflects what could be considered to be a serious violation of any legal standard or an intentional violation of any legal standard or University rule or regulation by Chief Grady.

- Whether Chief Grady failed to keep his direct report informed of developments in the *Rifkin* case and of the potential for sanctions and/or investigations of the Department.

1. The Rifkin case proceeded in a substantially similar manner to other criminal cases until the motion hearing. Chief Grady was not informed by the State's Attorney that anything out of the ordinary was anticipated. In fact, Chief Grady had his administrative assistant and two lieutenants attempt to contact the SA's office to ascertain the nature of the hearing and to have the lieutenants provide her with the statements she had requested. The State's Attorney refused to meet with the lieutenants and did not provide any information to suggest the hearing would be anything other

than routine. There was no hint that there could be adverse consequences to any participant or the University Police.

2. Chief Grady attempted on several occasions immediately following the hearing and throughout the evening on the day of the hearing to contact Dr. Williams. Dr. Williams did not answer the Chief's calls nor did he return them.

- Whether a Department officer under the supervision of Chief Grady informed witnesses in the Rifkin matter that their statements would not be turned over to the States Attorney of DeKalb County if they wished not to be involved in the proceedings.

    1. The students only agreed to provide written statements after being convinced to by Chief Grady.
    2. Lieutenant Ramakrishnan informed the students that they were likely to be required to attend a hearing at the time they provided the statements.
    3. Lieutenant Ramakrishnan has no recollection of making any statement that could have been interpreted to suggest the statements would not be turned over to the State's Attorney.

- Whether Chief Grady, without notice to his direct report or other executive staff, accessed his University-issued laptop and deleted and/or copied all or substantially all of the files on the University-issued laptop.

    1. The transfer of information from Chief Grady's computer to an external storage device was completed in accordance with past University practices and existing protocols used by University IT personnel on numerous occasions within the Department of Police and Public Safety.
    2. The transfer was executed by IT personnel, not Chief Grady.
    3. No computer files were damaged or destroyed and no files were removed from Chief Grady's laptop computer.
    4. Chief Grady was given permission from his direct report Dr. Eddie Williams, upon accepting the position of chief of police at NIU, to co-mingle and maintain personal files and records on his University computer as their use in presentations and document development could provide value to the University and other institutions of higher education. This agreement was reiterated in August 2006 when Chief Grady accepted an assignment as the Senior Advisor to the Minister of Interior in Iraq.

- Whether the foregoing conduct constituted a violation of the Illinois Computer Crime Prevention Law, 720 ILCS 5/16D-1, and/or any University computer or information technology resources policy.

1. The transfer of information from Chief Grady's computer to an external storage device was completed in accordance with past University practices and existing protocols used by University IT personnel on numerous occasions within the Department of Police and Public Safety.
2. The transfer was executed by IT personnel, not Chief Grady.
3. No computer files were damaged or destroyed and no files were removed from Chief Grady's laptop computer.
4. Chief Grady has permission from his direct report Dr. Eddie Williams, upon accepting the position of chief of police at NIU, to co-mingle and maintain personal files and records on his University computer as their use in presentations and document development could provide value to the University and other institutions of higher education. This agreement was reiterated in August 2006 when Chief Grady accepted an assignment as the Senior Advisor to the Minister of Interior in Iraq.
5. Chief Grady believed he would continue in his employment at NIU and the information on the storage device would continue to be used to support University activities. This device merely allowed him to access the information to continue his work from an external location.

- Whether the foregoing constitute cause under Section 14 of the Letter of Agreement.

    1. Nothing delineated in this document reflects what could be considered to be a serious violation of any legal standard or an intentional violation of any legal standard or University rule or regulation by Chief Grady.
    2. It is the standard operating procedure required by Chief Grady and communicated to the members of his department to forward all statements and reports to the SA in situations where a prosecution is contemplated.
    3. Lieutenant Kartik Ramakrishnan testified that this was the standard operating procedure he was trained to follow.
    4. Lieutenant Kartik Ramakrishnan was the person responsible for adhering to the standard operating procedure in this instance.
    5. Chief Grady had no reason to believe that the standard operating procedure was not being followed. There had been no instance where the State's Attorney had advised the Chief that there had been any cases where officers failed to provide information in a timely manner.
    6. Chief Grady first became aware that there was an issue with the missing statements the week of the hearing in November, 2012.
    7. Chief Grady was told by Lieutenants Kartik Ramakrishnan and Jason John that the statements had been misplaced and had not been turned over to the State's Attorney.

8. Upon learning of the issue Chief Grady advised Lieutenant Kartik Ramakrishnan to prepare a report explaining what had happened and to immediately take that report and the statements to the State's Attorney.

9. Chief Grady attempted on a number of occasions to alert his direct report, Dr. Eddie Williams, once there was an indication that there was or likely could be a problem surrounding the Rifkin case, but his calls were unanswered and went unreturned.

10. The court found a Brady violation based on the testimony of Lieutenant Kartik Ramakrishnan that he had misplaced the statements.

11. A Brady violation does not require the intent to conceal relevant evidence. Lieutenant Ramakrishnan's admission to misfiling the statements was sufficient.

12. The only sanction imposed by the court was that the defense would be allowed to tell the jury that the defense had not been provided with the statements in a timely manner.

13. The court did not find that Chief Grady had acted improperly in any way with regard to either the Brady violation or in his handling of the matter after it came to his attention.

14. The transfer of information from Chief Grady's computer to an external storage device was completed in accordance with past University practices and existing protocols used by University IT personnel on numerous occasions within the Department of Police and Public Safety.

15. No computer files were damaged or destroyed and no files were removed from Chief Grady's laptop computer.

16. Chief Grady has permission from his direct report Dr. Eddie Williams, upon accepting the position of chief of police at NIU, to co-mingle and maintain personal files and records on his University computer as their use in presentations and document development could provide value to the University and other institutions of higher education. This agreement was reiterated in August 2006 when Chief Grady accepted an assignment as the Senior Advisor to the Minister of Interior in Iraq.

17. Lieutenant Ramakrishnan informed the students that they were likely to be required to attend a hearing at the time they provided the statements.

18. Lieutenant Ramakrishnan has no recollection of making any statement to anyone that could have been interpreted to suggest the students statements would not be turned over to the State's Attorney.